

FILED

JUL 19 2018

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
　　　　　　　　DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JAYDEEP SHAH, M.D. M.A.　　　　　§
　　　　　　　　　　　　　　　　§
　　　　　　　　Plaintiff,　　　　§　　SA18CA0751  XR
　　　　　　　　　　　　　　　　§
V.　　　　　　　　　　　　　　　§　　CIVIL ACTION NO._____
　　　　　　　　　　　　　　　　§
BAPTIST HEALTH SYSTEM, INC.,　　§
GRAHAM REEVE, DANA KELLIS and　§
WILLIAM WAECHTER　　　　　　　§
　　　　　　　　　　　　　　　　§
　　　　　　　　Defendant.　　　　§

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Jaydeep Shah, M.D. M.A. and files this, his Original Complaint complaining of Baptist Health System, Graham Reeve, Dana Kellis and William Waechter and for causes of action would show as follows:

### I.　　Parties

1.　　Plaintiff Jaydeep Shah, M.D. M.A is an individual residing at 503 Geese Landing, Glen Allen, Virginia.

2.　　Defendant Baptist Health System, Inc. (BHS) is a Texas Corporation with its office and principal place of business at 215 East Quincy Street, Suite 200 San Antonio, Texas 78215 and can be served by serving any officer with citation and a copy of this petition at 215 East Quincy Street, Suite 200 San Antonio, Texas 78215. This court therefore has personal jurisdiction over Baptist Health System, Inc.

3.　　Defendant Graham Reeve (Reeve) is a natural person, believed to reside in San Antonio, Texas. Reeve may be served with process by serving him with citation and a copy of this petition

1

at 8727 Timberland Trail, Fair Oaks Ranch, Texas 78015-6529.   This court therefore has personal jurisdiction over Defendant Reeve.

4.      Defendant Dana Kellis, M.D. (Kellis) is a natural person, believed to have at one time resided in San Antonio, Texas.  At all times relevant to this lawsuit Kellis was residing in the State of Texas and has subsequently relocated.  For purpose of jurisdiction over non-residents Plaintiff would plead that pursuant to Tex. C. Prac and R. Code §17.042 Kellis entered into contracts with Texas residents and/or committed torts in Texas and as such has sufficient related and unrelated minimum contacts with Texas to make him amenable to the jurisdiction of its Courts.

5.      Pursuant to Tex. C. Prac. R. Code §17.044 (a) (3) Kellis may therefore be served by with citation and a copy of this petition by serving same on the Secretary of State of Texas who may then forward citation to Kellis by United States Certified Mail at BayCare Health Systems, 2985 Drew Street, Clearwater, Florida 33759.   This court therefore has personal jurisdiction over Defendant Kellis.

6.      Defendant William Waechter (Waechter) is a natural person, believed to reside in San Antonio, Texas.  Waechter may be served with process by serving him with citation and a copy of this petition at 8035 Vanity Hill, San Antonio, Texas 78256.   This court therefore has personal jurisdiction over Defendant Waechter.

## II.      Venue and Subject Matter Jurisdiction

7.      Pursuant to 28 U.S.C. §1331 this Court has subject matter jurisdiction over this claim because the lawsuit involves the application of the federal anti-trust statutes, specifically the Sherman Anti-Trust Act, 15 U.S.C. §1 et. seq.

8.      Pursuant to 28 U.S.C. §1332 this Court has subject matter jurisdiction over this claim because the lawsuit is also based on diversity of citizenship.  The Plaintiff is a resident of the State of Virginia and all defendants are either residents of Texas or Florida.

9.      Pursuant to 28 USC 1391 (b) (1) and (2) Bexar County and this judicial district is the county/district of proper venue for this case because the acts that form the basis of this suit all occurred in Bexar County, and Bexar County is the county of residence for three of the four Defendants.

### III.      Statement of Facts

**A.      Background:**

10.     In 2006 Dr. Shah entered into an income guarantee agreement with STAR Anesthesia, P.A. (STAR) and North Central Baptist Hospital (NCB) to be the Director of Pediatric Anesthesiology and Perioperative Services at NCB[1] **[Exhibit 1: 2012 BHS-STAR Agreement for Anesthesia Services]**. In November 2007, Dr. Shah became a full-partner and shareholder with STAR **[Exhibit 2: 2007 STAR-Shah Professional Service Agreement]**. Dr. Shah was suspended from providing clinical services by STAR effective December 9, 2016 **[Exhibit 3: December 9, 2016 STAR Suspension Notice]** and terminated from STAR on December 30, 2016 **[Exhibit 4: December 30, 2016 STAR Termination Notice]**.

11.     Dr. Shah provided clinical and administrative services to NCB as its Director of Pediatric Anesthesiology and Perioperative Services continuously and without interruption from 2006 until November 30, 2016, when the income guarantee portion of that agreement ("pediatric income

---

[1] The initial agreement was renewed in 2010 and then rolled into the 2012 agreement between STAR and BHS (Exhibit 1) as "Exhibit C" and "Exhibit F" in the agreement.

guarantee") [Exhibit 1: "Section F"][2] was terminated by an amendment between STAR and BHS [Exhibit 5: First Amendment to the Agreement for Anesthesiology Department Coverage]. Dr. Shah was informed of the termination of the pediatric income guarantee on December 1, 2016 by STAR CEO Steve Robert. Dr. Shah's position as NCB Director of Pediatric Anesthesiology and Perioperative Services remained intact.

12.    As the NCB Director of Pediatric Anesthesiology and Perioperative Services, Dr. Shah's duties included, but were not limited to, consulting with NCB's CEO about critical personnel and processes involved with operating room services; assist in the evaluation of performance criteria; coordinate and communicate with all other Directors/Chiefs of Surgical, Anesthesiology, and nursing specialties; provide direction and coordination regarding policy and procedural compliance; provide oversight to clinical enterprise operations; assist in the preparation and implementation of the financial budget of the Service; and monitor compliance with quality and efficiency performance measures as detailed in the 2012 Agreement for Anesthesia Services BHS-STAR. [Exhibit 1, "Exhibit C"].

13.    As STAR provided only management and administrative services to Dr. Shah, the surgeons and patients for whom Dr. Shah provided clinical ("medical") anesthesia services were under the control of Dr. Shah. Further, Dr. Shah was responsible for his scheduling and assignments of pediatric anesthesia cases at NCB [Exhibit 2, STAR-Shah PSA, Sections 4 and 12].

---

[2] STAR and the Baptist Health System entered into an Agreement dated June 1, 2012, that provided for Anesthesia Department Coverage. This Agreement is attached hereto as [Exhibit 1]. As part of that Agreement, specifically Exhibit "F" (North Central Baptist Hospital Pediatric Guaranteed Income Agreement) to that Agreement, Baptist was obligated to pay STAR an income guaranty of $500,000 per year and an annual stipend of $200,000 for pediatric anesthesia coverage. Dr. Shah was the designated full-time employee as part of that Agreement. Therefore, Dr. Shah was to receive a guaranteed salary from Baptist of $500,000 per year, payable on a monthly basis, to STAR. STAR, in turn, paid Dr. Shah. The Guaranteed Income Agreement also provided $200,000 per year for coverage from other physicians from STAR who covered for Dr. Shah in his off-service time.

14.     Over the course of ten plus years providing clinical services at NCB, Dr. Shah cultivated and maintained, through a strong work ethic and exemplary performance as a pediatric anesthesiologist, a large referral base of surgeons and patients, that routinely and specifically sought out his clinical services for pediatric anesthesia care. Dr. Shah provided anesthesia to well-over 600 pediatric patients in his final fiscal year of working at NCB. Following the termination of the pediatric income guarantee on November 30, 2016, Dr. Shah continued to provide pediatric anesthesia care for the surgeons and their patients with whom he had long standing business relationships at NCB, including providing call coverage.

15.     The abrupt termination of the Pediatric Income Guarantee also financially affected STAR's pediatric anesthesiologists that also provided call coverage at NCB in that each realized an overall one-third reduction in pediatric call pay.  The effect was predictable. STAR's pediatric anesthesia Director had consternation with STAR's administration for its unilateral decision in agreeing with BHS to terminate the Pediatric Income Guarantee [**Exhibit 6: Burgos Email to Robert December 1, 2016].** Pediatric anesthesia coverage at NCB moving forward was in disarray [**Exhibit 7: Emails from Bowen & Keener, December 3 &4; Exhibit 8: Bonilla Text December 15, 2016].** Some of STAR's pediatric anesthesiologists reduced or resigned their participation on the pediatric anesthesia team at NCB within days following the termination of the Pediatric Income Guarantee [**Exhibit 9: Kriedel Letter; Exhibit 10: Kruger Petition].**

16.     The turmoil caused by the abrupt termination of the income guarantee quickly spilled over and poisoned Shah's employment/ownership relationship with STAR. On December 9, 2016 STAR moved to terminate Shah based on what it alleged was moral turpitude.  In a letter from STAR CEO Steve Robert to Shah, STAR contended that Shah had misrepresented the on-going ability of STAR to provide pediatric anesthesia care stating:

"This letter shall serve as notice of STAR Anesthesia's intent to terminate the Agreement…due to absolutely false statements you made to North Central Baptist and its physician community asserting that STAR's pediatric anesthesia coverage is going away…" **[Exhibit 3: December 9, 2016 STAR Suspension Notice]**

STAR's attorney's letter dated December 22, 2016 to Dr. Shah made it clear that STAR intended to terminate him based on the "statements made to the BHS Regional Pediatric Medicine Committee at their most recent meeting in December and to others related to STAR's pediatric anesthesia coverage and services." **[Exhibit 11: Burton to Shah, Letter December 22, 2016]**.

17.     Shah vehemently denied any wrong doing, but after notice and a hearing, STAR terminated Shah on December 30, 2016. Thereafter Shah instituted an arbitration proceeding for violation of his employment agreement. In January 2018 the arbitration hearing occurred and in February 2018 the arbitrator handed down a decision sustaining STAR's termination of Shah.[3] He is now in the process of appealing the decision to the 4th Circuit Court of Appeals.

**B.     Tortious Interference BHS Claim of Exclusivity:**

18.     Over the course of a decade working for STAR and BHS, Shah had developed significant and long-standing business relationships with local pediatric surgeons for whom he provided pediatric anesthesia. Many of these surgeons, either by oral or written statements to Waechter, demanded access to using Dr. Shah for their pediatric surgical cases at NCB following Dr. Shah's termination from STAR **[Exhibit 12: Baldwin Letter to Waechter Jan 24, 2017; Exhibit 13: Warman Letter to Waechter Jan. 2017]**. BHS repeatedly denied the surgeons' requests and completely prevented Dr. Shah from continuing to provide pediatric anesthesia services at NCB. The basis of the refusal to allow Dr. Shah to provide his services was the 2012 Agreement for

---

[3] The statements made by Robert and evidenced by Exhibit 27 were the sole basis of Dr. Shah's termination. This evidence is clear, however in the arbitration proceeding between STAR and Shah, the Arbitrator somehow found in favor of STAR that Dr. Shah was terminated for engaging in activities prescribed under his BHS and NCB administrative roles prior to December 7, 2016.

Anesthesiology Department coverage BHS had entered with STAR, wherein STAR became the "exclusive" provider of anesthesiology services at four of BHS's facilities – Baptist Medical Center, Northeast Baptist Hospital, North Central Baptist Hospital, and Mission Trail Baptist Hospital **[Exhibit 1]**.

19.     At the time of execution of the "exclusive" agreement, and thereafter, STAR was the largest anesthesiologist group in San Antonio and offered the full spectrum of anesthesiology services. The primary reason delineated for the "exclusive" arrangement between BHS and STAR was so BHS could provide quality patient care in a cost-effective and efficient manner **[Exhibit 1]**. The obvious incentive for STAR to enter the "exclusive" agreement was financial and market power. As part of the agreement, BHS guaranteed STAR, based on CPT codes, either $45 per point or $50 per point [4] (for designated "Special Procedures") for general operating room cases. Further, STAR gained a significant market share as it would now be the exclusive provider of nearly 30,000 cases annually requiring anesthesia **[Exhibit 1: "Exhibit E"]** and have the right of first offer to be the exclusive provider of anesthesia services to any future acute care facility that BHS may establish **[Exhibit 1: Section 3(d)]**.

20.     However, the exclusive nature of the agreement notwithstanding it was never truly "exclusive". From the onset of the agreement, BHS required STAR to subcontract with other non-STAR anesthesiologists after failing to convert multiple surgeons to exclusively use STAR for their anesthesia needs in BHS **[Exhibit 14: Email of Rod Huebbers]**.  So, for example, STAR

---

[4] The methodology for reimbursement for anesthesia services is based on the total time anesthesia is delivered to a patient in conjunction with standardized base points related to the complexity of the surgery.  Determination of base points is based on the Relative Value Guide published by the American Society of Anesthesiologists. Time points are accrued every fifteen minutes for which the patient receives anesthesia.  The sum of base points plus time points are then multiplied by the agreed upon reimbursement rate per point from third party payors to actuate the final payment for anesthesia services. The 2018 Medicare payment rate per point is approximately $22.

subcontracted with Tejas Anesthesia, its primary rival in the market, based solely on the demands of cardiac, pediatric, and orthopedic surgeons who had long-standing business relationships with Tejas anesthesiologists, but who were not part of the BHS/STAR exclusive arrangement **[Exhibit 15: Emails Regarding Subcontracting Non-STAR Anesthesiologist; Exhibit 16: STAR-Tejas Anesthesiologist Independent Contractor Agreement]**. Then, as Tejas' roster of subcontracted anesthesiologists changed, STAR would amend its subcontracts to add and subtract Tejas anesthesiologists to comply with the demands of individual surgeons or BHS.[5]

21.     Again, by way of example, at the behest of BHS, STAR provided a subcontracting waiver to four (4) Tejas pediatric anesthesiologists so they could provide coverage for two pediatric cardiac surgeons at North Central Baptist with whom they had a long-standing business association.  STAR also agreed to add a new Tejas anesthesiologist primarily to cover a cardiac surgeon STAR no longer wanted to provide coverage for.  BHS also required STAR to subcontract with an anesthesiologist per the request / preference of two vascular surgeons practicing at Northeast Baptist Hospital and to allow another anesthesiology group to practice at Mission Trail Baptist hospital outside of the "exclusive" arrangement altogether based solely on the preference of four surgeons.[6]  BHS controlled the relationship between it and STAR. In July 2015 for example, BHS required STAR to subcontract with an anesthesiologist despite STAR's objections, to provide services to an orthopedic spine surgeon based on the surgeon's complaints to NCB

---

[5] The Tejas Pediatric anesthesiologists resigned in August 2014 after not having reached an agreement with STAR Anesthesia as to the amount of financial compensation and the required call obligations associated with their subcontract with STAR.  While STAR received $42 or $50 per point based on CPT codes for general operating room cases from BHS and charged STAR Anesthesiologist 5% for billing services, they paid subcontracted Tejas Anesthesiologists $38 or $45 per point for corresponding CPT codes and charged 9% for billing services **[Exhibit 16: STAR-Tejas Anesthesiologist Independent Contractor Agreement]**.

[6] Though a contract for Plaza Anesthesia was drafted to cover Mission Trail Baptist hospital in July 2014, it was not executed due to rejection of terms by Plaza Anesthesia.  Likewise, an amendment to the BHS-STAR Agreement to allow Plaza Anesthesia to perform services outside of the "exclusive" arrangement was drafted, it, too, was not executed, due to Plaza Anesthesia's rejection of terms. Three of the four surgeons that used Plaza Anesthesia stopped practicing at Mission Trail Baptist afterwards.

administration that the STAR anesthesiologists assigned to his cases were not adequately taking care of his patients. In fact, as part of the BHS Anesthesia Scheduling algorithm, it was left to the discretion of the Chief Operating Officer of each of the BHS facilities to decide whether to allow a non-STAR affiliated anesthesiologist to perform a case at their respective facility [**Exhibit 16: STAR-Tejas Anesthesiologist Independent Contractor Agreement, "Exhibit F"**].

22.     The lack of any real exclusivity becomes important in the spring of 2017. Over the course of a decade working for STAR and BHS, Shah developed significant and long-standing business relationships with a large referral base of local pediatric surgeons and patients for whom he provided pediatric anesthesia [**Exhibit 17: List of Surgeons for Shah**].  As set out herein above, many of these surgeons, either by oral or written statements to Waechter, specifically demanded to use Dr. Shah for their pediatric surgical cases at NCB [**Exhibit 12: Baldwin Letter to Waechter Jan 24, 2017; Exhibit 13: Warman Letter to Waechter Jan 2017**].  Despite a long history and consistent pattern of accommodating the needs of San Antonio's surgeons throughout the life of the "exclusive agreement," BHS refused the pediatric surgeons' multiple requests to secure Dr. Shah's services.

23.     As BHS and STAR moved forward in 2017 without Shah, surgeons who had utilized Shah for years, were told repeatedly that they could no longer utilize Dr. Shah's services because of the "exclusive" agreement between STAR and BHS. BHS's steadfast refusal to allow Dr. Shah to provide clinical care under the guise of the 2012 "exclusive" BHS-STAR Agreement for Anesthesia Services completely destroyed his existing business relationships with pediatric surgeons and patients.  Part of the claim of exclusivity is based upon an attachment to the 2012 Agreement wherein as a condition of participation in the "exclusive" agreement, anesthesiologists were to sign the form to have acknowledged the terms and conditions delineated in the agreement

between STAR and BHS. Dr. Shah was never presented this form to sign, nor to his knowledge, did any of STAR's anesthesiologists execute the "Acknowledgment" of the 2012 BHS-STAR Agreement for Anesthesia Services **[Exhibit 1, "Exhibit A"]**.[7] Therefore, not only was the agreement never treated as an exclusive, but Dr. Shah never agreed to forego providing medical services to patients based upon that agreement.

24.     On or about March 7, 2017, Dr. Shah sent a letter to Waechter to request that he be allowed to participate in providing pediatric anesthesia services at North Central Baptist Hospital **[Exhibit 18: CASA Letter to Waechter dated March 7, 2017]**.   The next day, March 8, 2017, the exclusive agreement notwithstanding, BHS unconditionally renewed Dr. Shah's staff privileges **[Exhibit 19: BHS Renewal of Shah Privileges]**.  BHS did so knowing it had an exclusive contract with STAR, that Shah no longer worked under that contract, and that Shah's primary BHS facility was NCB **[Exhibit 20: Armstrong Certified Letter to Shah; Exhibit 21: Recredentialing Emails].**  Having given Dr. Shah unconditional privileges, BHS then convened a special meeting of pediatric surgeons practicing at North Central Baptist Hospital on March 13, 2017, with Waechter in attendance, to discuss the myriad of complaints from surgeons regarding STAR's inability to provide pediatric anesthesia coverage. BHS's steadfast refusal to allow Dr. Shah to practice at NCB following that meeting unduly interfered with (1) Dr. Shah's long-standing business relationships with the surgeons who were pleading to have Dr. Shah be made available to perform their cases, and (2) the apparent waiver granted by the BHS Medical Executive Board and the BHS Board of Trustees when it unconditionally renewed Dr. Shah's BHS staff privileges

---

[7] STAR inserted the "clean sweep" language found in Exhibit A of the 2012 BHS-STAR Agreement into its subcontractor agreements, however, it never presented to nor required its own employed physicians to sign the Acknowledgement form or draft any amendments to the professional service agreements of its physicians, its internal Bylaws, or any other document that would constitute a condition of participation in the BHS-STAR "exclusive" agreement by STAR anesthesiologists.

and not deny him Medical Staff membership and privileges on the basis that the privileges he sought were pursuant to an "exclusive" agreement **[Exhibit 19: BHS Renewal of Shah Privileges; Exhibit 22: BHS Medical Staff Bylaws 9/26/2017, Sections 5.6 and 11.9.1.1]**.

25.     Undaunted, the pediatric surgeons, having been denied access to Dr. Shah, filed a "quality" complaint with the BHS Regional Pediatric Medicine Committee and addressed the committee on March 22, 2017. No acknowledgement or acceptance of their requests was forthcoming from BHS. On or about April 6, 2017, a complaint letter from the Chief of Pediatric Surgery and Chair of the Pediatric Operations Committee at North Central Baptist was sent to STAR, with a copy to BHS, regarding the growing concerns with the pediatric anesthesia coverage provided by STAR since Dr. Shah's termination in December 2016. The letter also addressed the well-known fact that STAR allowed surgeons to use non-STAR anesthesiologists to assist them in the surgical care of adults at NCB solely based on surgeons' preferences **[Exhibit 23: Letter from Baldwin to Robert, April 6, 2017]**. BHS, through Reeve, acknowledged the complaint via an email response on April 7, 2017, in which BHS committed to "ensure the best care for our patients" **[Exhibit 24: Email between Baldwin and Reeve, April 2017]**. But there was no effort made by BHS to allow Dr. Shah to provide pediatric anesthesia services at NCB.

26.     In May of 2017, BHS and STAR executed an amendment to include St. Luke's Baptist Hospital under the "exclusive" arrangement between the two organizations. Soon thereafter, BHS amended the "exclusive" agreement to remove STAR from providing obstetrical anesthesia services at St. Luke's Baptist hospital upon the demands of the Obstetrical Gynecologists who practiced at that facility and whose preference was to continue their long-standing business relationship with Tejas Anesthesia **[Exhibit 25: Excerpt from Robert Deposition 144:2 – 145:21]**. Once again, BHS demonstrated through its conduct that it controlled the exclusive

agreement, and that it was not exclusive at all, but was continually subject to modification as it deemed suitable to meet the demands of surgeons and the needs of San Antonio's patient population.

27.     Refusing to allow Dr. Shah to practice because of the "exclusive" agreement between BHS and STAR is simply not credible. BHS had made amendments to the "exclusive" agreement as well as demanded and secured other exceptions to the exclusivity on multiple occasions based solely on surgeons' preferences. Not doing so for Dr. Shah despite the numerous complaints from pediatric surgeons substantially interfered with Shah's longstanding business relationships with San Antonio surgeons. The list of surgeons that Shah could no longer work with is significant **[Exhibit 17: List of Surgeons for Shah].** This interference continues as of the date of this original petition and has crippled Dr. Shah's pediatric anesthesia practice clinically and financially, making it impossible for Dr. Shah to continue to work in San Antonio where he has resided for over 19 years and built a reputation as one of the best pediatric anesthesiologists in the community.

**C.     BHS Anti-Trust Conduct:**

28.     To state a claim under Section 1 of the Sherman Anti-Trust Act, 15 U.S.C. §1 et. seq, claimants must show that the defendants (1) engaged in a conspiracy (2) that produced some anti-competitive effect (3) in the relevant market. *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n, 776 F.3d 321, 327 (5th Cir. 2015).* Further, Section 1 prohibits concerted action which unreasonably restrained trade in the relevant market. *American Needle, Inc. v. Nat'l Football League, 560 U.S. 183, 190 (2010)* ("Section 1 applies only to concerted action that restrains trade").

**(i)     Relevant Market:**

29.     Defining the relevant market is a factual inquiry ordinarily reserved for the jury. *Syufy Enterprises v. American Multicinema, Inc.,* 793 F.2d 990, 995 (9th Cir. 1986), cert. denied, 479 U.S. 1031, 107 S. Ct. 876, 884, 93 L. Ed. 2d 830 (1987). San Antonio, Bexar County, Texas is the seventh largest city in the United States with a population of almost 1,470,000.  Bexar County itself has almost 2,000,000 residents and is home to several large U.S. military installations that brings with it a steady flow of patients not only from across Texas, but from all fifty states and some foreign countries.  Within this teeming population center sits the BHS hospital network with over twenty-eight different hospitals and specialized facilities that stretch across the county.

30.     Not only does BHS control a significant, if not the majority of the Bexar County medical facilities, but that control is even more substantial when it comes to facilities able to perform surgery on children and/or neonates. BHS has four Level III Neonatal Intensive Care Units (NICUs), located at NCB, St. Luke's Baptist Hospital, Northeast Baptist Hospital, and Baptist Medical Center, all of which are subject to the 2012 "exclusive" Agreement.[8] In addition, BHS's Regional Children's Center located at NCB is the ***only*** comprehensive pediatric hospital program in north Bexar County with a Pediatric Intensive Care Unit (PICU), a dedicated Pediatric Emergency Room (ER), and the ability to perform surgery on pediatric and neonatal patients. It has a catchment area that includes Schertz, Selma, Spring Branch, Seguin, Universal City, Canyon Lake, and New Braunfels, the latter being named the second-fastest growing city in the US in 2015 by the US Census Bureau. BHS also has a pediatric patient transport program to allow for the rapid transfer of pediatric and neonatal patients from these outlying areas to NCB making it the hospital

---

[8] BHS controls sixty-seven percent (67%) of the total number of non-academic, civilian NICUs in San Antonio that can provide continuous life support and comprehensive care for extremely high-risk newborn infants and those with complex and critical illness. These facilities offer prompt and readily available access to a full range of pediatric medical subspecialties. Further, the NICU located at NCB is the only one in north central San Antonio and in its catchment area. These units offer advanced ventilation and surgeries that may require anesthesia. The NCB NICU has recently applied for level IV designation from the Texas Department of State Health Services.

of choice for pediatric and neonatal care for residents and pediatric specialists of north Bexar County, Guadalupe County, and Comal County.

31.     The only other civilian, non-academic, high-acuity NICUs, PICUs, and dedicated Pediatric ERs in San Antonio are located at Methodist Children's Hospital (covered exclusively by Tejas Pediatric Anesthesia, STAR's rival in the market place **[Exhibit 26: Methodist Healthcare Letter February 1, 2017]**) and CHRISTUS Children's Hospital of San Antonio (covered exclusively by STAR Anesthesia **[Exhibit 27: CHRISTUS Memo March 1, 2017]**). Due to the restrictive covenants delineated in the BHS-STAR Agreement for "Director" positions **[Exhibit 1]** and Dr. Shah's PSA with STAR **[Exhibit 2]**, Dr. Shah did not hold medical staff privileges or practice at either Methodist or CHRISTUS Children's hospitals during the previous ten years nor was he able to do so following the termination of his employment with STAR and BHS due to the exclusivity of anesthesia services at these non-BHS hospitals.

32.     The inability of a pediatric anesthesiologist, especially one that specializes in the care of neonates, to practice at BHS's hospital facilities, or to be contracted by STAR, excludes him or her from practicing in 83% of civilian, non-academic hospitals that provide neonatal and/or pediatric care. In Dr. Shah's particular case, in as much as he was persona non-gratis with Tejas Pediatric Anesthesia[4] due to his simultaneous employment with BHS and STAR, after being terminated by STAR, he could no longer provide pediatric anesthesia care at any hospital in San Antonio despite being one of the best pediatric anesthesiologists in the region.

**(ii)     Conspiracy:**

33.     Although BHS had required STAR to subcontract with Tejas Pediatric Anesthesia and other local anesthesiologists based on surgeons' requests in early 2013, it was not only complicit in STAR's unscrupulous efforts in monopolizing non-academic, civilian anesthesia services in San

Antonio, but used STAR as a tool in effecting that goal. Prior to and following the execution of the 2012 BHS-STAR Agreement, BHS maintained multiple contracts for various anesthesia services based on surgical service lines. For example, BHS paid STAR for pediatric anesthesia services at NCB under the 2012 Agreement while simultaneously paying Tejas Pediatric Anesthesia for identical clinical services at St. Luke's Baptist Hospital. Thus, the execution of the 2012 Agreement increased the overall costs of pediatric anesthesia care for BHS.

34.     To reduce its costs, BHS conspired with STAR to eliminate market competition in San Antonio. First, it allowed STAR to pay subcontracted Tejas Pediatric anesthesiologists less than market value for its anesthesia services and charge nearly two-fold for billing services in comparison to STAR physicians. Second, it allowed STAR to impose burdensome call responsibilities on subcontracted Tejas Pediatric anesthesiologists. Specifically, Tejas Pediatric anesthesiologists were required to take adult call at NCB in addition to already taking pediatric call at St. Luke's Baptist Hospital, their designated primary facility[9] **[Exhibit 28: Email between Jaehne, Spiekerman, Shah, and Siegel, January – February 2013]**. Third, in the event that a subcontracted Tejas Pediatric anesthesiologist voluntarily chose not to participate on the adult call schedule at NCB, BHS allowed STAR to impose a substantial monetary fee to have STAR physicians "cover" their call at NCB. None of these monetary or non-monetary arrangements were approved by the BHS Board or addressed in the BHS Medical Staff Bylaws. Dr. Shah was aware of STAR's underhanded dealings with Tejas Pediatric Anesthesia, its only competitor in the market for pediatric anesthesia services, but he not only informed BHS of the on goings between STAR and Tejas, including, and not limited to, inviting BHS administrators to meetings between

---

[9] At the time STAR subcontracted with Tejas Pediatric Anesthesia, BHS rules and regulations required a medical staff physician member to designate his or her primary facility and participate on its on-call roster for emergencies. Tejas Pediatric Anesthesia physicians fulfilled the BHS medical staff obligations by designating St. Luke's Baptist Hospital as their primary facility and participating on their on-call roster for pediatric surgical emergencies.

STAR and Tejas, but also steadfast supported the subcontracting of Tejas Pediatric Anesthesiologists so that they may continue to cover the cases of pediatric surgeons with whom they had long-standing professional relationships **[Exhibit 15: Emails Regarding Subcontracting Non-STAR Anesthesiologist; Exhibit 28: Email between Jaehne, Spiekerman, Shah, and Siegel, January – February 2013]**.

35.     In tacit response to Shah's efforts to protect the quality of pediatric anesthesia in BHS, notwithstanding the STAR monopoly, beginning in the fall of 2016, BHS, in combination with STAR, began a concerted effort to eliminate the ability of any pediatric anesthesiologist in San Antonio not under contract with STAR from providing care to children and neonates in BHS facilities. Consistent with his prior position on the issue Dr. Shah opposed BHS's efforts. Yet, BHS was undeterred by Dr. Shah's arguments **[Exhibit 29: Email from Shah to Reeve, November 7, 2016]**. The first step in eliminating Dr. Shah both as a viable anesthesia provider and as a proponent of patient care came with the November 30, 2016 amendment to the alleged exclusivity contract between STAR and BHS **[Exhibit 5: First Amendment to Agreement for Anesthesiology Department Coverage, Section 7]**, whereby the guaranteed income portion of the contract that applied *only* to Dr. Shah was eliminated.  That amendment came with STAR's full knowledge and without objection from STAR because part of the arrangement that eliminated Shah's salary guarantee involved the subsequent addition into the STAR exclusive contract two other hospitals in the BHS network, Resolute Health **[Exhibit 5: First Amendment to Agreement for Anesthesiology Department Coverage, Section 1]**, and subsequently, St. Luke's Baptist hospital.  Thus, in exchange for eliminating Shah's salary guarantee, STAR not only received two additional hospitals, but in the process acquired a true monopoly over the BHS hospital system in Bexar County by May 2017 **[Exhibit 25: Excerpt from Robert Deposition 144:2 – 145:21]**.

36.     Dr. Shah was informed of the termination of the Pediatric Income Guarantee on December 1, 2016, after its execution by STAR and BHS. STAR's CEO Steve Robert told Dr. Shah that the reason for the termination was due to compliance issues brought to the attention of STAR by BHS **[Exhibit 25: Robert Deposition 17:18 – 18:8; 21:3-8; 28:6-12].** Reeve later emphatically denied that there were any compliance reasons to terminate the Pediatric Income Guarantee **[Exhibit 30: Reeve Deposition 68: 24 – 70:10]** but rather it was part of ongoing negotiations that gave both organizations durable market power in terms of excluding pediatric anesthesia competitors.

37.     BHS anticipated Shah would resign from STAR. Reeve openly stated that "Dr. Shah wasn't going to be at North Central that [they] knew of because of where [they] were headed with the contract" **[Exhibit 30: Reeve Deposition 95: 13-15].** However, when Dr. Shah did not resign from STAR and remained in his positions in BHS providing clinical and administrative services, both organizations realized eliminating Shah would require more drastic measures.

38.     The actions that BHS undertook to eliminate Dr. Shah were not only unethical and reprehensible, but also unlawful. *First*, on December 7, 2016, Dr. Shah attended the BHS Regional Pediatric Medicine Committee (Meeting) at 6:00 pm as an official committee member. During the Meeting, confidential discussions regarding potential changes to pediatric anesthesia coverage in BHS ensued. The minutes of the Meeting make it clear that Dr. Shah did not initiate the discussion but rather it had been raised by a pediatric ENT surgeon **[Exhibit 31: Excerpts from the Minutes of the December 7, 2017 Meeting].** Other committee members also expressed similar concerns regarding pediatric anesthesia coverage. Dr. Kellis, the Chief Medical Officer of BHS (CMO), who was in attendance at the Meeting, assured the committee members that "he considers himself to be up to date and is not aware of any changes and that there is no plan to be without 24/7 pediatric anesthesia coverage." **[Exhibit 31: Excerpts from the Minutes from December 7, 2016**

Meeting]. However, while the Meeting was in progress, unbeknownst to Dr. Shah, Kellis sent a text message to Reeve stating, "I'm at the Pediatrics committee, and they're in an uproar because Jay Shah has told them we're backing away from Pediatric anesthesia. I've never heard that?" **[Exhibit 32: Texts Between Kellis, Reeve, and Robert December 7, 2016].** ***Dr. Shah did not make this statement***. The meeting minutes make it clear that the statement, "BHS may be totally without coverage for pediatric anesthesia" was made by the pediatric ENT surgeon in attendance at the Meeting and ***NOT*** Dr. Shah **[Exhibit 13: Minutes from December 7, 2017 Meeting]**.

39.     ***Second***, based on false information from Kellis, Reeve moved quickly and unethically to poison Shah's employment/ownership relationship with STAR. Reeve, who was not present at the Meeting, subsequently forwarded Kellis' text message along with his own comments to STAR's CEO, Steve Robert, stating that "Jay has riled up the docs at NCBH. Will need your help. Details tomorrow." This message was sent at 8:08 p.m. on December 7, 2016, roughly 15 minutes prior to the conclusion of the Meeting **[Exhibit 32: Texts Between Kellis, Reeve, and Robert]**. Reeve's texts to Robert indicate he, Reeve, had been receiving information regarding the Meeting from Kellis almost in real time. **[Exhibit 32: Texts Between Kellis, Reeve, and Robert December 7, 2016]**. Most alarming is Reeve's clear intent on harming Dr. Shah. In his text exchange with Mr. Robert, he states he wants a "new face" to replace Dr. Shah (at 8:49 p.m.) and then at the end of their conversation he tells Robert, "Let's get ready to strap it on…" (at 8:56 p.m.) **[Exhibit 32: Texts Between Kellis, Reeve, and Robert; Exhibit 32: Excerpts from Reeve Deposition dated October 23, 2017; 103:5 – 108: 1]**.

40.     ***Third***, within twenty-fours of the Meeting, on the morning of December 8, 2016, Kellis, Reeve, and Waechter further embellished on their lies to STAR in a phone conversation with Mr. Robert wherein they stated that Dr. Shah had told physicians at the Meeting the night before that

adult anesthesiologists were going to do pediatric cases instead of pediatric anesthesiologists at NCB [**Exhibit 25: Excerpts from Robert Deposition dated September 26, 2017, 74:7 – 75:17; Exhibit 33: STAR's Responses to Interrogatory #2]**. *Dr. Shah never said or implied anything of the kind during the Meeting* [**Exhibit 33: Excerpts from the Minutes from December 7, 2016 Meeting**].

41.    The December 7, 2016 Meeting had all of the trappings of a confidential peer review setting, including, but not limited to, the minutes of the Meeting [**Exhibit 31: Excerpts from the Minutes from December 7, 2016 Meeting**] and the follow-up letter to Reeve [**Exhibit 34: Gowan Letter Dec 13th to Reeve**] both being marked as "Confidential Peer Review". Further, given that the Meeting was a committee approved by BHS and (1) operated under written bylaws approved by the BHS Medical Executive Board and the Governing Board, and (2) was authorized to evaluate the quality of medical and health care services, it is considered to a be medical peer review committee [**TEX. OCC. CODE § 151.002(a)(8)**]. However, the clandestine maneuverings by BHS drew scrutiny and discontent from surgeons in attendance at the December 7, 2016 Meeting as BHS had shown no consideration for the needs or wants of the pediatric specialists that practiced at NCB. Further, and more importantly, as STAR and BHS were amid negotiations for a monopoly for anesthesia services [**Exhibit 14: Excerpts from Reeve Deposition dated October 23, 2017, 86:2-11**] the criticisms leveled by the committee members at the Meeting negatively impacted the process of achieving that monopoly.

42.    BHS's onslaught of false accusations against Dr. Shah over the course of 24 hours from December 7 to December 8, 2016 had the effect BHS desired - it caused irreparable and terminal damage to Dr. Shah's relationship with STAR[10].  In an apparent effort to mitigate the damage done

---

[10] Kellis would further violate the sacrosanct privilege of peer review by providing an Affidavit [**Exhibit 35: Kellis Affadivit dated December 5, 2017**] and subsequently testifying at the Arbitration proceeding between SHAH and

by Reeve and Kellis, Dr. Gowan, the Chairperson of the December 7, 2016 Meeting, wrote a letter to Steve Robert, dated December 27, 2016. To maintain the privileged confidentiality of the meeting proceedings, Dr. Gowan made a general statement in which he noted that he had reviewed "the notes, minutes, and correspondence of the pediatric quality committee regarding the December's meeting [and]...the word or words Star, or Star Anesthesia do not appear on any of these items, nor are any disparaging remarks about any individual or organization noted." Moreover, he made it absolutely clear that the conversations that took place at the Meeting were "privileged as part of BHS quality review." **[Exhibit 36: Gowan Letter to Robert December 27, 2016]**. However, STAR was not deterred by Dr. Gowan's letter as it was a partner to the conspiracy in monopolizing anesthesia services. On December 30, 2016, STAR terminated Dr. Shah for having committed acts of moral turpitude that brought STAR into public disrepute, notwithstanding the fact that the deliberations of a peer review committee are not "public". Steve Robert, CEO of STAR, was unequivocal that the decision to terminate Dr. Shah was based on (1) the text messages from Reeve and Kellis that emanated from the December 7, 2016 BHS Regional

---

STAR in January 2018 that (1) Dr. Shah stated that Baptist and STAR were backing away from providing pediatric anesthesia coverage at NCB; (2) Dr. Shah made a forceful argument that the pediatric surgeons practicing at NCB should be concerned that they would not have adequate pediatric anesthesia coverage for their cases; (3) Dr. Shah stated STAR Anesthesiologists that would provide coverage would not be competent, qualified, or able to provide competent pediatric anesthesia care; (4) Dr. Shah stated that STAR and Baptist would staff pediatric cases with adult anesthesiologists rather than pediatric anesthesiologists, and that the pediatric anesthesiologists in STAR would likely leave STAR because of unfavorable economic decisions made regarding pediatric anesthesia; and (5) Dr. Shah painted the picture that this would result in fewer pediatric anesthesiologists and more adult anesthesiologists providing services to Children's Hospital surgeons. In stark contrast to these fabricated statements by Kellis, the minutes of the December 7, 2016 Meeting note that Dr. Shah stated that "BHS will not have the *same individuals* providing pediatric anesthesia that they have had in the past **[Exhibit 9: Kriedel Letter; Exhibit 10: Kruger Petition]**. Dr. Shah stated that is unknown to him who this coverage will be provided by as he has not been included in the detailed discussions regarding future coverage. Dr. Shah requested that the minutes reflect that this subject was not on the agenda and that he did not bring this concern to the Committee, nor was he aware he would be asked to discuss this. Dr. Shah stated that San Antonio is very rare and only has about 25 pediatric specific anesthesiologists practice and that through recruitment over the years he has managed to put together a small group for BHS. Dr. Shah stated that there have been no complications related to care delivered by these pediatric specific anesthesia and that is something to be proud of." In total, these statements represent the entirety to what Dr. Shah stated at the December 7, 2016 Meeting regarding the discussions of pediatric anesthesia coverage **[Exhibit 31: Minutes from December 7, 2016 Meeting]**.

Pediatric Medicine Committee Meeting and (2) the subsequent communications with BHS on December 8, 2016 as to what was allegedly said by Dr. Shah at that peer review Meeting [**Exhibit 25: Excerpts from Robert Deposition dated September 26, 2017, 39:16 - 44:3**]. Reeve's lack of any personal knowledge of the December 7, 2016 Meeting and Kellis' disclosure of peer review privileged proceedings to a third-party make their false statements even more egregious.

43.     Further, it is without question that the statements attributed to Dr. Shah in Kellis' Affidavit [**Exhibit 35: Kellis Affidavit**] are utterly false when compared to the minutes of the December 7, 2016 Meeting [**Exhibit 31: Minutes of the December 7, 2016 Meeting**]. The violation of privilege associated with the December 7, 2016 meeting by Kellis and Reeve make their actions not only unethical and reprehensible, but also unlawful [**TEX. OCC. CODE § 160.007(a)** ("Except as otherwise provided by this subtitle, each proceeding or record of a medical peer review committee is confidential, and any communication made to a medical peer review committee is privileged")].

44.     Having eliminated Shah's financial arrangement under the 2012 contract, BHS, acting with STAR, then set out to prevent Shah from practicing anywhere in the BHS system. First, as set out in paragraphs 1-44 herein above, BHS and its officers provided untruthful information and made unfounded allegations against Shah that resulted in his termination from STAR. Shah went from being an integral component of pediatric anesthesiology at BHS, to having no relationship with the BHS system whatsoever, aside from continuing to have privileges to practice at BHS. But, while Shah's privileges were unconditionally renewed on March 8, 2017, BHS, acting in concert with STAR, continued to deny Shah the ability to earn a living by providing pediatric anesthesia for the patients of his long-time surgical colleagues. BHS had always interceded to allow non-STAR anesthesiologists to practice when surgeons demanded, even in the face of STAR

objections. Instead, using STAR's objection as an excuse, BHS ignored the requests of both Shah and area pediatric surgeons to have Shah continue to provide his services. Moreover, it did so knowing that, as of January 1, 2017, STAR only had five (5) fellowship trained or equivalent pediatric anesthesiologists that covered NCB **[Exhibit 32: Text Message between Kellis, Reeve, and Robert December 7, 2016].** Following the termination of Dr. Shah, BHS had difficulty in staffing pediatric surgical cases with pediatric fellowship or equivalent anesthesiologists through the STAR "exclusive" arrangement **[Exhibit 24: Baldwin Email to Reeve, April 6, 2017].** A conspiracy that began in late 2016 to eliminate Shah's professional presence was complete by May 2017 when BHS executed a second amendment between itself and STAR to fold in St. Luke's Baptist hospital under the "exclusive" Agreement despite clear evidence that STAR could not provide sufficient coverage with pediatric fellowship trained or equivalent anesthesiologists for neonatal and pediatric surgeries at NCB.

**(iii)    Anti-Competitive Intent:**

45.    Federal case law is clear that increased costs and decreased physician choices are hallmarks of anti-trust law in the medical profession, *Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1305 (11th Cir. 2010). Pediatric patients require specific and special care, not the least of which is the administration and provision of surgical anesthesia. Anesthesia practices appropriate for an adult could easily kill or cripple a child. There is no question that the acts of BHS and STAR as set out herein above, eliminated significant and important choices for pediatric anesthesia services. *First,* in concert with STAR in its treatment of Tejas Pediatric Anesthesia, by endorsing STAR to impose burdensome call requirements on Tejas Pediatric anesthesiologists, above and beyond of that required of other anesthesiologists per the BHS Medical Staff Bylaws, or otherwise be subject to monetary fees, BHS eliminated eighteen (18)

pediatric anesthesiologists from practicing at NCB when Tejas Pediatric Anesthesia was forced to terminate its contract with STAR in August 2014 because of unfavorable financial and clinical demands. *Second*, by bringing St. Luke's Baptist Hospital into the monopoly in May 2017, in spite of the overwhelming evidence that STAR continued to have difficulty in providing adequate pediatric anesthesia coverage at NCB as late as April 2017, BHS unreasonably restrained trade by eliminating twenty-five (25) pediatric anesthesiologists (Shah and Tejas Pediatric Anesthesiologists), representing nearly 70% of all pediatric anesthesiologists in San Antonio, from clinically practicing in BHS.[11] *Third*, by barring Dr. Shah from working at NCB under the guise of the "exclusive" agreement Acknowledgment **[Exhibit 1: Exhibit A]**, which neither Dr. Shah nor any other STAR Anesthesiologist ever executed, BHS unduly prevented Dr. Shah from providing pediatric anesthesia services at NCB.

46.     The letters, requests, and complaints of area pediatric surgeons make it clear that Dr. Shah was an integral part of the pediatric surgical community and network and that his absence caused a significant decline in the quality of child surgical healthcare **[Exhibit 37: Baldwin Letter to Reeve, April 17, 2017; Exhibit 40: Tarasiewicz Text Messages February 15-16, 2017; Exhibit 39: Text Message from Juan Bonilla to Baldwin, April 7, 2016]**. To put the harm in context, BHS's disruption of Dr. Shah's long-standing business relationships with Bexar County pediatric surgeons developed over the course of a decade working in BHS, resulted in the diversion of well-over 600 pediatric surgical cases annually to other, less qualified personnel at STAR that would have otherwise been performed by Dr. Shah **[Exhibit 40: Case Counts & Earnings Summaries]**.

---

[11] Following Methodist Children's Hospital announcement of its exclusive arrangement with Tejas Pediatric Anesthesia in February 2017, the previously five (5) Methodist Children's hospital employed pediatric anesthesiologists joined Tejas Pediatric Anesthesia, making it a group of twenty-four (24) pediatric anesthesiologists. Dr. Shah's inability to practice in BHS thereby made a total of 25 pediatric anesthesiologists, or nearly seventy percent (70%) of all pediatric anesthesiologists in San Antonio, unable to work in BHS.

On average, these cases generated revenue in excess of what was guaranteed to STAR per case, prior to the November 30, 2016 amendment, thereby offsetting the total amount of money that BHS would have to pay STAR under the 2012 Agreement. Thus, STAR and BHS reaped the financial rewards from refusing to allow Dr. Shah to practice in BHS, while, based on the numerous complaints received by STAR and BHS, caused harm to competition as consumers (surgeons and patients) wanting Dr. Shah were prohibited from utilizing his pediatric anesthesia services for their cases in BHS.

47.     The demands of the BHS Department of Pediatric Medicine members to have specific credentialing for pediatric anesthesiologists **[Exhibit 34: Gowan letter to Reeve, December 13, 2016]** in line with the community standards found in other San Antonio children's hospitals **[Exhibit 43: Children's Hospital of San Antonio Pediatric Anesthesia Privileges]**, were finally addressed by BHS and STAR in June 2018 **[Exhibit 42: Thatcher Email to Shah, May 7, 2018; Exhibit 43: Thatcher Email of June 14, 2018; Exhibit 44: BHS Pediatric Anesthesia Credentialing Form]**. BHS's permissiveness in allowing STAR to staff pediatric surgical cases with anesthesiologists who lack pediatric fellowship training or equivalent experience is readily evident in its pediatric anesthesia credentialing form. The fact that BHS requires no more experience than having performed 15 pediatric cases per year (or 30 pediatric cases over two years) to be credentialed as a pediatric anesthesiologist in their hospitals speaks for itself. In comparison, the Children's Hospital of San Antonio requires that applicants have performed at least 75 cases per year or 150 cases over two years. The low threshold BHS has set in its pediatric anesthesia credentialing form serves only to perpetuate the harm that began in the spring of 2017 wherein STAR can have an anesthesiologist who performs less than two (2) pediatric cases per month provide surgical anesthesia to the most vulnerable patient population in its hospitals.

48.     Healthcare costs are multifactorial when considering the needs of a pediatric or neonate patient including the hidden costs incurred by the parents from having taken time-off from work to not only bring the child to the hospital but also to care for their child postoperatively. The weight of available evidence shows better results, from fewer complications to shorter hospital stays, when newborns and children undergo surgical procedures in environments that have expert resources for pediatric patients, including pediatric anesthesiologists, compared with nonspecialized centers (J. Am. Coll Surg. 2014 Mar; 218(3): 479-487). The American College of Surgeons' *Optimal Resources for Children's Surgical Care* (2015) delineates the need for pediatric anesthesiologists for optimizing the delivery of children's surgical care in today's competitive national health care environment. Following Dr. Shah's termination from STAR and BHS's continual refusal to allow Dr. Shah to provide pediatric anesthesia services at NCB, pediatric surgical cases were at times delayed or cancelled due to the lack of availability of a pediatric anesthesiologist [**Exhibit 37: Baldwin Letter to Reeve, April 17, 2017**] creating an unnecessary burden on the surgeons and the parents of their patients in terms of efficiency, costs, and patient satisfaction, three key determinants in defining the "quality" of medical providers in the current healthcare paradigm.

49.     As with anesthesia billing, hospital charges for surgery are also based on time.  The average cost per minute of operating room time in U. S. hospitals is $62 (*Shippert, R., Am J. of Cosmetic Surgery, Vol. 22, No. 1, 2005; Macario, A.,  J. of Clinical Anesthesia, Vol. 22, 2010).* It has been shown that pediatric surgery efficiency significantly improves when the case is performed by a pediatric anesthesiologist (*Dewyer NA, et al, Ear Nose Throat J. 2017 June; 96(6):E24-E28; Muhly W. et al., Perioperative Care and Operating Room Management, Vol. 7. 12-17).* BHS's allowing of non-pediatric fellowship trained or equivalent STAR anesthesiologists to perform

pediatric surgical cases most likely increased surgical costs related to longer intraoperative and postoperative time spent by non-pediatric anesthesiologists managing the care of pediatric patients.

50.     However, most striking in terms of costs is the amount charged per point to consumers and third-party payors by STAR.  On average, STAR charged $130 per point **[Exhibit 40: Case Counts and Earnings Summaries]** for the cases STAR anesthesiologists performed.  This exceeds the guaranteed amount per point by BHS nearly threefold. STAR's pricing scheme was known to and approved by BHS by virtue of its quarterly review and reconciliation of STAR's collections data **[Exhibit 1: Exhibit E, Section 7]**. BHS did not object to STAR's billing practice as its payments to STAR would be lessened by an increase in STAR's collections. For example, if the consumer is a self-pay patient (uninsured or their procedure is not covered by insurance), the overtly excessive charge for anesthesia services by STAR would serve to pad its collections and reduce the amount BHS would have to pay STAR. The fact that the exorbitant amount charged by STAR could pose a significant financial strain on less affluent parents was of no consequence to BHS. At the time the 2012 Agreement was executed, the number of self-pay patients ranged from six percent (6%) to seventeen percent (17%) in the facilities subject to the Agreement **[Exhibit 1: Exhibit E, "Material Change Data"]**.  The current US Census Bureau estimates for persons without health insurance, under age 65 years, in Bexar County and San Antonio is 16.6 percent and 20.3 percent, respectively.

**(iv)  Injury to Competition:**

51.     Under the Sherman Act the elimination of just one provider can work the competitive harm and decreased quality of healthcare that is actionable, *Oltz v. St. Peter's Community Hospital*, 861 F.2d 1440, 1447-48 (9th Cir. 1988).  Thus, not only did BHS and STAR eliminate Shah's presence, but based on the facts as set out above, a jury could reasonably conclude that eliminating Shah was

at least in part of the goal of BHS and STAR.  That alone demonstrates the necessary intent to eliminate competition under the Sherman Act. The chaos and detrimental effect of Shah's exclusion is readily apparent from the surgeon letters following in the months after his termination, repeatedly begging to be allowed to utilize Shah.

52.     As noted above, BHS had a sufficient percentage of buyers (surgeons whose patients required NICU, PICU, and Pediatric ER services) and to which the sellers (70% of pediatric anesthesiologists in San Antonio) were foreclosed from a sufficient percentage of the market (83% of all of the comprehensive NICUs in San Antonio (BHS and CHRISTUS hospitals) as well as NCB, the only comprehensive pediatric hospital in north San Antonio) for a sufficient period of time (50% of BHS facilities starting in 2012, and 67% of BHS facilities when a complete monopoly was given to STAR as of May 2017). Further the BHS-STAR Agreement deterred or precluded new entry (Dr. Shah was denied to practice in BHS after starting his new company). As such, the "exclusive" Agreement between BHS and STAR allowed the two organizations to obtain and maintain market power by effectively excluding its competitors (Shah and Tejas Pediatric Anesthesia) from the market. See, *ZF Meritor, supra, 696 F.3d at 286* ("The share of the market foreclosed is important because, for the contract to have an adverse effect on competition, the opportunities for other[s] . . . to enter or remain in that market must be significantly limited.") (internal quotation marks omitted); *Stop & Shop Supermarket Co., supra, 373 F.3d at 66* ("If an exclusive dealing contract cuts off stores like [plaintiff] from an unduly large percentage of the available market for its goods, it and others like it may cease to provide [the relevant product.]; *McWane, Inc., 2014 WL 556261 at \*19 (FTC 2014)* ("exclusive dealing can be harmful when it enables a firm to acquire or maintain market power by impairing the ability of rivals to grow into effective competitors that might erode the firm's dominant position"). As such, BHS violated the

Sherman Act § 1. Elimination of Shah and Tejas Pediatric Anesthesia injured competition by not only prohibiting most pediatric anesthesiologists in San Antonio to practice in any BHS facilities, but also by preventing patients and surgeons from selecting their pediatric anesthesiologists. *Oltz v. St. Peter's Community Hospital*, 861 F.2d 1440, 1447-48 (9th Cir. 1988) "One segment was the market in which anesthesia service providers compete for staff privileges at hospitals; the other was the patient market for anesthesia services" and that "a showing of injury to competition in either market suffices for the rule of reason".

53.     It is without question that a tying arrangement existed in the BHS-STAR arrangement. As found in *Jefferson Parish Hospital v. Hyde* (1984), "the anesthesiological component of the package offered by the hospital could be provided separately and could be selected either by the individual patient or by one of the patient's doctors if the hospital did not insist on including anesthesiological services in the package it offers to its customers. As a matter of actual practice, anesthesiological services are billed separately from the hospital services petitioners provide." Despite Dr. Shah's privileges being renewed unconditionally in March 2017 by BHS and the surgeons' repeated demands of wanting to utilize Dr. Shah's services based on his superior clinical skills and the lack of consistency of STAR staffing pediatric surgical cases with pediatric fellowship-trained or equivalent anesthesiologists, BHS forced pediatric surgeons and their patients (customers) to only use STAR anesthesiologists. Further, having established a monopoly in pediatric and neonatal surgical care in northern Bexar county, Comal County, and Guadalupe County, as well as, in conjunction with STAR, controlling 83% of civilian, non-academic, high-acuity NICUs in San Antonio, BHS had a monopoly power in the tying product of pediatric anesthesia services. As NICU and PICU patients are not readily transferred to other medical facilities except when the need for a higher level of medical care arises, these patients were not

able to seek care at a competing hospital where they could choose the anesthesiologist of their choice. Further, as state and federal regulations mandate specific and necessary equipment, policies, training, and personnel to allow for the safe care of pediatric and neonatal patients, most medical facilities in the relevant market do not offer pediatric and neonatal surgery, thereby limiting the consumers' choices for medical care.

54.   For durable market power, BHS colluded with STAR to maintain the "exclusive" agreement through improper conduct. The Department of Health and Human Services Office of Inspector General (OIG) and the Department of Justice, both of which are responsible for oversight and enforcement of the Anti-Kickback Statute have also cited situations where there could be a "reverse kickback." In a reverse kickback a hospital-based physician group would make some payment or provide some benefit beyond the value of the underlying clinical arrangement. Such payment would be viewed as an inducement for the hospital providing an exclusive contract to engage in or maintain such an agreement for applicable services. Essentially, the payment to the hospital is viewed as the price for guaranteeing exclusivity, which ensures business generation for the hospital-based physician group.

55.   BHS was aware that STAR did not fully charge BHS for certain anesthesia procedures (nerve blocks) and billing modifiers that may have been paid by commercial insurers but rather billed BHS based on "self-imposed lesser charges" **[Exhibit 45: Email from Jaehne to Reeve, October 21, 2013]**. The savings to BHS is in the range of $446,000 to $1.6 million annually. These lesser charges were under the pretext of "non-payable codes" and being a "fair and good steward pertaining to contracted service and financial services between [BHS and STAR]".[12] BHS, who

---

[12] Based on Medicare rules, regulations, and Correct Coding Initiative (CCI) edits, CPT codes 64400-64530 (Nerve blocks) may be reported on the date of surgery if performed for postoperative pain management rather than as the means for providing the regional block for the surgical procedure.

acquired a significant discount on otherwise billable services from STAR, in turn, allowed STAR, with its full knowledge and concurrence, to not pay Tejas Anesthesia for these legitimate anesthesia procedures. STAR, based on its billing scheme with Tejas anesthesiologists, would not only continue to enjoy the overall financial benefits of the "exclusive" Agreement with BHS but also be able to recoup some revenue lost from this discount to BHS by paying subcontracted anesthesiologists at below market rates and charging nearly double for billing services [**Exhibit 16: STAR-Tejas Anesthesiologist Independent Contractor Agreement**].

56.     Despite numerous complaints from surgeons regarding STAR's anesthesia services, Baptist and STAR maintained and expanded the "exclusive" agreement to increase their profits while reducing the quality of care delivered to patients. Following the second anniversary of the initial three-year agreement, BHS leadership requested a meeting with STAR "to discuss the program" [**Exhibit 46: Email from Reeve to Jaehne, July 2014**]. Following that meeting, STAR placed, at no cost to BHS (1) physician board runners at Baptist Medical Center (BMC) [**Exhibit 47: Email from Robert to Shah, September 2014**]; (2) STAR schedulers at NCB and BMC; and (3) contracted with a Hospitalist physician group, which was concurrently under contract with BHS, to staff the preoperative clinic at NCB [**Exhibit 48: Email from Baker to Shah, August 2014**]. These additional services were not delineated in the 2012 BHS-STAR Agreement [**Exhibit 1: Exhibit B**] or in any subsequent addendum to the Agreement and were specifically intended as a reverse kickback to BHS for not terminating the Agreement [**Exhibit 49: Email from Keener to Robert, December 2016**]. These concessions are not representative of STAR's modus operandi with any other hospital or hospital system as it has not placed any board runners, schedulers, or non-anesthesia medical providers in any medical facility or hospital system besides BHS. Further, the incremental hours expended in the provision of these services are not billable to third-party

payors. Similarly, BHS, did not charge STAR for space, equipment, or BHS staff it utilized to conduct its business within BHS's facilities [**Exhibit 7: Email from Keener, December 5, 2016**].

57.     Under Stark, a financial relationship includes both direct and indirect ownership and compensation relationships. An indirect compensation arrangement exists if there is an unbroken chain of persons or entities with financial relationships between the physician and designated health services (DHS)  entity and the referring physician receives aggregate compensation from the person or entity in the chain within which the physician has a direct financial relationship that varies with the volume or value of referrals (or other business generated), and the DHS entity has such knowledge of such activity or recklessly or deliberately disregards it.

58.     The Baptist Orthopedic Hospital (BOH), which opened for business on October 27, 2016 on the campus of NCB, was constructed primarily for The San Antonio Orthopedic Group (TSAOG), under a co-management agreement with BHS. STAR had recently lost the bid to exclusively staff TSAOG's outpatient surgical center to Tejas Anesthesia. Further, the Vice-President of TSAOG, Dr. Sergio Viroslav, was at the time serving as the President of BHS's Medical Executive Board and had significant influence on the selection of the anesthesia providers for BOH. So that STAR would not lose the Baptist contract, BHS administrators, including Waechter, met with STAR to develop its proposal for TSAOG on September 9, 2016 [**Exhibit 50: Shah Anesthesia Director Log September 2016**]. Again, a reverse kickback was the underpinning of STAR's offer and eventual hire of a nurse practitioner to conduct preoperative evaluation services and have an anesthesiologist be "on call" to respond to any questions related to the patients of TSAOG from the surgeons and BHS floor and preoperative clinic nurses [**Exhibit 51: Email from Gotanco to Robert, October 2016**]. Neither the nurse practitioner nor the anesthesiologist's time was billable or compensated by BHS. This additional service was not

delineated in the 2012 BHS-STAR Agreement **[Exhibit 1: Exhibit B]**. By improperly providing STAR with details of TSAOG's anesthesiology service preferences, BHS maintained its exclusive arrangement with STAR; BHS cemented its dominance as the market leader of orthopedic surgery; and BHS allowed STAR to gain the volume of cases associated with "an undisclosed number of new physicians specializing in spinal procedures, total joint replacements and sports medicine" **[Exhibit 52: BOH Announcement Express News]**.

59.     When BHS executed the second amendment to its 2012 Agreement with STAR in mid-2017, incorporating St. Luke's Hospital in the exclusive arrangement and extending the Agreement for an additional three-year period, it did so despite evidence that showed STAR was unable to supply a better product, did not provide superior management, and neither STAR nor BHS obtained their monopolistic position by virtue of a historic accident. BHS's exclusionary conduct was based on obtaining a favorable financial position for itself regardless of the effect on the market patient population.  The second amendment to the 2012 Agreement allowed BHS to reduce its financial cap with STAR to $2.5 million and eliminate all its contracts with Tejas Anesthesia. In the process, STAR also gained a financial windfall from the volume of cases performed at St. Luke's Baptist Hospital now under its control. Given the tying arrangement between BHS and STAR, BHS (monopolist) was able to further its monopoly in the tying product (pediatric anesthesia services) to the detriment of consumers (surgeons and patients) by forcing them to use only anesthesiologists employed by STAR, most of whom were not pediatric fellowship trained or equivalent yet allowed to perform pediatric cases in BHS due to substandard credentialing requirements. BHS would be using ties, in this situation, to maintain its monopoly and its future profits in the monopoly-product market while drastically lessening competition in the relevant market. *Northern Pacific R. Co. v. United States, 356 U.S. 1 (1958)* The Court condemned the tie,

holding that the Sherman Act does not "requir[e] anything more than sufficient economic power [in the tying market] to impose an appreciable restraint on free competition in the tied product."

### IV.   Cause of Action: Tortious Interference with Business Relationship

Plaintiff incorporates paragraphs 1-27 as if fully set out herein under and in addition would plead as follows:

60.    The law in Texas requires a Plaintiff to prove (1) the existence of a contract that is subject to interference; (2) a willful and intentional act of interference by the defendant; and (3) that the defendant's intentional act of interference was a proximate cause of actual damages to the plaintiff.

61.    All three elements exist in this case.  The conduct of BHS in 2017, acting through Reeve and Waechter, after it unconditionally renewed Dr. Shah's privileges, whereby Shah and his surgeon clients were completely prevented from utilizing Shah's services, served to perpetrate BHS's tortious interference with Shah's existing business relationships with pediatric surgeons and patients. Having destroyed his relationship with STAR, BHS then used the demise of Shah's relationship with STAR, a relationship it destroyed, as the guise to then prevent Shah from practicing his profession in a state that recognizes that contractual relationships notwithstanding, patients and their providers have an absolute right to choose their medical care provider. When the surgeons with which Shah had long-standing relationships requested Shah's services, they were acting on behalf of surgical patients, all of whom were minor children, in an effort to provide the best medical care possible.

62.    In not allowing Dr. Shah to clinically practice at NCB, BHS diverted well over 600 pediatric surgical cases and their associated financial windfall to STAR.  Likewise, BHS financially benefitted in doing so by a reduction in the total amount of money that BHS would

have to pay STAR under the 2012 Agreement.   The result of BHS's conduct perpetrated by its three employees/officers was to deprive Dr. Shah of his primary source of income. By May of 2017, using the STAR contract as a guise to deny surgeon requests for Shah's services, BHS had completed the process of totally interfering with all of Shah's existing business relationships, causing irreparable damage to Shah's business by foreclosing him from the relevant market for pediatric and neonatal anesthesia services.

### V.    Cause of Action: Violation of the Sherman Anti-Trust Act, 15 U.S.C. §1 et. seq

Plaintiff incorporates paragraphs 1-59 as if fully set out herein under and in addition would plead as follows:

63.    Shah can factually meet every element of a Section 1 and Section 2 Sherman Anti-Trust Act claim.  First, there was clearly a conspiracy between two entities, BHS and STAR.  Acting through their officers, directors and other personnel, STAR and BHS effectively removed Shah from competing in the relevant market for pediatric and neonatal anesthesia care in Bexar County, Texas. Furthermore, Shah can show that the intent of the First and Second Amendments to the 2012 Agreement was to eliminate any competition in the provision of pediatric anesthesia.  As set out herein above, the substandard pediatric anesthesiology services that followed in the wake of Shah's exclusion is well documented.  In addition, because doctors generally do not work for a particular hospital, but instead enjoy staff, or "admitting," privileges at several hospitals, they are deemed to be separate entities, or independent contractors.  When one or more doctors at a hospital act to deny a doctor the right to practice his profession, as is the case here, that alone provides the necessary conspiracy for a Sherman Act claim.

64.    The facts show a clear intent on the part of both BHS and STAR.  Eliminating a highly qualified and renown pediatric anesthesiologist, as well as Tejas Pediatric Anesthesia, STAR's

only pediatric anesthesia competitors in the market, brought with it significant financial gain both to BHS and STAR.  BHS escaped a significant financial guarantee obligation and STAR acquired a monopoly over two additional hospital facilities within the BHS network. The fact that the new arrangement drastically undermined care and resulted in an inferior product are only magnified by the collusion and committal of unscrupulous, prohibited, and unlawful actions on the part of BHS and STAR to maintain and expand the "exclusive" Agreement.

65.     The harm to competition is also clear based on the facts. Shah performed well over 600 pediatric surgical cases at BHS in the last year he provided services.  After his termination from STAR, pediatric surgeons had to reschedule or cancel surgeries because STAR did not provide a qualified pediatric anesthesiologist to do their case or make repeated calls to STAR to confirm the availability of a pediatric anesthesiologist. The elimination of Dr. Shah and Tejas Pediatric Anesthesia from BHS facilities has not only brought inferior care to Bexar County but also injured competition in terms of reduced physician choices and increased costs to consumers.

66.     Finally, the acts of the Defendants and STAR clearly affects interstate commerce.  BHS receives federal funds, purchases all types of medical equipment from other states, treats patients who come in and out of San Antonio from other states and Mexico, and receives most of its reimbursements from national insurance companies.  Therefore, the jurisdictional aspect of an effect on interstate commerce is clearly satisfied.

67.     BHS's conduct has resulted in anti-trust damages of $9,625,819. Under the Sherman Act Shah is entitled to recover three times his actual amount of damages, plus his attorney's fees and costs.

WHEREFORE PREMISES CONSIDERED, Plaintiff prays that Defendants be cited to appear and answer herein, and upon trial on the merits or summary disposition, that Plaintiff be awarded damages as follows:

1.  $9,625,819 which represents the lost back pay and future compensation lost as a result of the interference with Shah's surgeon business relationships;

2.  $9,625,819 which represents the anti-trust damages suffered by Shah as a direct result of BHS's anti-competitive conduct.;

3.  Treble damages under the Sherman Act;

4.  Reasonable attorney's fees under the Sherman Act

5.  Costs of court, pre and post judgment interest at the maximum rate allowed by law;

6.  Any and all other relief whether at law or in equity to which the Plaintiff is otherwise entitled.

Dated: July 18, 2018

Respectfully submitted:

Weitz Morgan PLLC
100 Congress Avenue, Suite 2000
Austin, Texas 78701
Main: 512.370.5211
Fax: 512-852-4446

By:     /S/ Mark A. Weitz_____
        MARK A. WEITZ
        State Bar No. 21116500
        mweitz@weitzmorgan.com
        Direct Line 512-657-1849
        KRISTI MORGAN ARONICA
        State Bar No.24048677
        kristi@weitzmorgan.com
        Direct Line: 512-657-3196
        ATTORNEYS FOR JAYDEEP SHAH,
        M.D., M.A.