```
1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE WESTERN DISTRICT OF TEXAS
2                          SAN ANTONIO DIVISION

3

     JAYDEEP SHAH, M.D. M.A.,           .
4                                        .
                    PLAINTIFF,           .
5          vs.                           . DOCKET NO. 5:18-CV-751-XR
                                         .
6    VHS SAN ANTONIO PARTNERS LLC .
     D/B/A BAPTIST HEALTH SYSTEM,      .
7    ET AL,                              .
                                         .
8                   DEFENDANTS.          .

9

10

            TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS
11         BEFORE THE HONORABLE XAVIER RODRIGUEZ
                  UNITED STATES DISTRICT JUDGE
12                      JANUARY 10, 2019

13

14

15   APPEARANCES:
     FOR THE PLAINTIFF:      MARK A. WEITZ, ESQUIRE
16                           WEITZ MORGAN PLLC
                             100 CONGRESS AVENUE
17                           SUITE 2000
                             AUSTIN TX 78701
18
     FOR THE DEFENDANT:      CHRISTOPHER ROGERS, ESQUIRE
19                           HAYNES AND BOONE, LLP
                             2323 VICTORY AVENUE
20                           SUITE 700
                             DALLAS TX 75219
21

22   REPORTED BY:            GIGI SIMCOX, RMR, CRR
                             OFFICIAL COURT REPORTER
23                           UNITED STATES DISTRICT COURT
                             SAN ANTONIO, TEXAS
24

25
```

1          *(San Antonio, Texas; January 10, 2019, at 10:30 a.m., in*
2     *open court.)*
3               THE COURT:  18 civil 751, Jaydeep Shah versus VHS.
4               MR. WEITZ:  Good morning, your Honor.
5               THE COURT:  Morning.
6               Appearances, please.
7               MR. WEITZ:  Mark Alan Weitz for Jaydeep Shah, M.D.
8     M.A.
9               MR. ROGERS:  Chris Rogers on behalf of all
10    defendants, your Honor.
11              THE COURT:  Thank you.
12              So let me start with something easy in this otherwise
13    complicated case.  Docket 3 was the initial motion to dismiss
14    by the defendants and then there was an amended complaint
15    filed, and so now Docket 10 is a motion to dismiss the first
16    amended complaint.  Does that moot Number 3?
17              MR. ROGERS:  Yes, your Honor.
18              THE COURT:  So we'll start with something easy.  The
19    motion to dismiss Docket Number 3 is dismissed as moot.  So
20    that leaves us just with 10.
21              So, I guess, let me turn to the defendant,
22    Mr. Rogers.  And so I know you say that doctors try this all
23    the time and they are always unsuccessful with Sherman Act
24    claims and tortious interference claims, but why doesn't the
25    first amended complaint survive right now?  What is so

1   deficient about it that it doesn't move to summary judgment?

2          MR. ROGERS:  Yes, your Honor.

3          There's three issues.  One is it doesn't allege

4   antitrust injury, which is a required component of either a

5   Sherman Act Section 1 claim, or a Sherman Act Section 2 claim.

6          The second reason is that he doesn't define a

7   relevant product market.  The response to the motion to

8   dismiss goes into some length about the relevant geographic

9   market, that a relevant market for Sherman Act purposes has

10  two components, a relevant product market and a relevant —

11         COURT REPORTER:  Slow down.

12         MR. ROGERS:  Yes, ma'am.

13         — has two components, a relevant product market and

14  a relevant geographic market, and he did not allege any facts

15  to support his alleged relevant product market.

16         And, third, his tortious interference claims are

17  somewhat messy.  Some of that is by, I believe, design.  There

18  are some claims that might be barred by an arbitration ruling

19  that exists between Dr. Shah and his former group, STAR

20  Anesthesia, and so he's tried to allege maybe tortious

21  interference with a contract, maybe tortious interference with

22  a prospective business relationship, and maybe tortious

23  interference with the existing business relationship.

24         All of those claims, your Honor, we think fall down

25  if the Sherman Act claims do not survive.  And so we think

1    dismissal is appropriate at this moment.

2           There is a side issue, your Honor, about proper

3    parties.  We have alleged that the parent corporation's —— a

4    number of facts have been alleged to them, and that the

5    individual defendants really aren't tied into the nexus of

6    facts that constitute as claims either.

7           THE COURT:  So let's start with injury.  So the

8    doctor is claiming that his income has been affected, so why

9    isn't that enough of an injury to survive?

10          MR. ROGERS:  If I may, I can give you a brief

11   background, just about the doctor, and then I'll answer your

12   question directly.

13          Dr. Shah executed an income guarantee with North

14   Central Baptist Hospital in 2006.  That's not income per say,

15   that's a promise from the hospital to pay a minimum for his

16   services.  He was an anesthesiologist providing anesthesiology

17   services to patients at North Central Baptist.

18          THE COURT:  Take deep breaths and slow down.

19          MR. ROGERS:  Yes, your Honor.

20          So this guarantee existed in 2006.  In 2007 Dr. Shah

21   became a partner with STAR Anesthesia, a group that in 2012

22   entered into an exclusive coverage agreement with the Baptist

23   Health System, which includes North Central Baptist.  That

24   coverage agreement covered anesthesia services in general, not

25   just the pediatric anesthesia services that Dr. Shah provided.

1   His guarantee was incorporated into that 2012

2  coverage agreement.  So as of 2012 Dr. Shah was a partner in

3  STAR, providing services pursuant to a coverage agreement that

4  included a minimum guarantee for pediatric anesthesia

5  services.  In 2016 that coverage agreement was amended to omit

6  the guarantee, not to change anything else about the

7  circumstances.  STAR was still the exclusive provider of

8  anesthesia services for the Baptist Health System.

9   I wish I could come up with a shorter word than

10  anesthesia, to say it repeatedly, but I apologize.

11   And so STAR was still the exclusive provider.

12  Dr. Shah was still a partner at STAR.  But the elimination of

13  that guarantee, and Dr. Shah alleges some actions on behalf of

14  individuals at Baptist, poisoned the well between STAR and

15  Shah.

16   STAR terminated Dr. Shah, which meant he was no

17  longer permitted to provide services under the exclusive

18  coverage agreement.  He was still a member of the medical

19  staff, and, in fact, got reappointed to the medical staff of

20  the Baptist Health System thereafter, but he was no longer

21  subject to that exclusive coverage agreement.  And, as such,

22  he was excluded from providing anesthesia services at North

23  Central Baptist by the then CEO, who is now a defendant in the

24  case.

25   So Dr. Shah alleges this exclusion is a Sherman Act

1    violation.  And one component of that is antitrust injury,

2    meaning harm to competition.  So the cases are legion, but

3    they say that in order to prove antitrust injury one has to

4    show harm to competition, not to an individual competitor.

5           And when you boil it down, Dr. Shah's ultimate

6    complaint is that the CEO of North Central Baptist didn't

7    provide an exception to the exclusivity agreement with STAR

8    Anesthesia, and that refusal prevented him from practicing at

9    North Central Baptist.

10          He broadens that to include other exclusions, but,

11   ultimately, if you look at the damages in the amended

12   complaint, the damages are really about his practice.  So he's

13   alleging harm to his practice.

14          THE COURT:  So basically you are saying, okay, he

15   didn't meet the elements of injury for the Sherman Act, but

16   you may be conceding that he's alleging injury for purposes of

17   tortious interference?

18          MR. ROGERS:  Yes, your Honor.

19          The tortious interference, one of the elements of the

20   tortious interference claim, whether its under contract

21   existing — prospective business relationship or existing

22   business relationship, if that cause of action is recognized

23   by the Fifth Circuit, is an independent unlawful act.  And in

24   the response, Dr. Shah, I think, accepts that his independent

25   unlawful act here is the Sherman Act violation.

1    THE COURT:  Okay.  Let me stop you here.  The

2  arbitration that was held —

3    MR. ROGERS:  Yes, your Honor.

4    THE COURT:  — was it just between STAR and Dr. Shah,

5  or was somehow Tenet implicated in that arbitration?

6    MR. ROGERS:  Neither Tenet entity, nor VHS, the named

7  entity here, who is the operating entity for the Baptist

8  Health System, was a party to that arbitration.  The

9  arbitration was between STAR and Dr. Shah.

10    Petition to confirm that award was filed.  The award

11  found that STAR terminated Dr. Shah pursuant to appropriate

12  contractual rights.  We think that that's a barrier for

13  Dr. Shah right now, and maybe why he didn't allege tortious

14  interference with the contract between STAR and Shah, because

15  we would say that that issue has been precluded by the

16  arbitrator's finding.

17    THE COURT:  Let me turn to you, Mr. Weitz.

18    MR. WEITZ:  Yes, sir.

19    THE COURT:  How do you survive on the antitrust?

20    MR. WEITZ:  Your Honor, I believe that it's quite

21  easy.  First of all, let me go back to my counterpart's

22  argument.  First of all, we did allege a clear, relevant

23  market.  I think it would be very difficult to argue that we

24  did not.  It was clearly defined by Bexar County and the

25  contiguous area, and I think that our petition, however one

1 might find some aspect of it wanting, does not want for

2 detail.  It's probably one of the most detailed that I've ever

3 put together.

4          Secondly, injury.  It is true that we do allege a

5 personal injury, but we also allege that what happened with

6 regard to the STAR/VHS contract affected 70 percent of the

7 pediatric anesthesiologists in Bexar County and the contiguous

8 counties.  And we do that at paragraphs 34 through 37.

9          THE COURT:  I was just going to ask you in one

10 second.

11          MR. ROGERS:  Paragraph 45.  I'll stop.

12          THE COURT:  Thank you.  Hold on.

13          Okay.  Go ahead.  What pages?

14          MR. ROGERS:  It's paragraphs — easier if we go

15 paragraphs:  34 through 37; paragraph 45; 51 through 53; 59;

16 and 64 through 65.

17          And if the court would permit, I would also add this:

18 One of the intriguing things about this case, and what makes

19 it unique, and what makes it very survivable on the Sherman

20 claims, is that Dr. Shah wasn't just anybody.  He sat at the

21 top of the food chain with regard to the provision of

22 pediatric anesthesiology in Bexar County and the San Antonio

23 area.

24          A hallmark of an antitrust damage is the limitation

25 of adequate medical services.  I think it's difficult, at

1  least at the pleading stage, to argue that the removal of a

2  person of that stature, particularly one that not only headed

3  up this exclusive arrangement but was also the head of Baptist

4  Health Systems Inc. anesthesiology and pediatric, to argue

5  that to have taken him out of the market did not affect the

6  ability of yourself and myself to have our grandchildren

7  receive adequate pediatric anesthesia, I think is a difficult

8  one to maintain at least at the pleading level.

9          I think that the harm to medical care that the case

10  law, and I'll use my colleague's — is legion about what

11  happens when you do something in a health setting that removes

12  adequate health care.  And I think it's very difficult to

13  argue here from a damage standpoint under the Sherman Act that

14  when they did what they did, that they didn't do that.

15          And I think one of the interesting facts about this

16  case, and I guess if Mr. Rogers and I could go back and talk

17  to his client and the clients, we might say this, what gave it

18  wheels was when they reinstated his privileges.  Because one

19  of the things that if you do health care, you go into this law

20  about privileges.  And that's a tough nut to crack.

21          A hospital can decline privileges, make a

22  determination that they should be limited, things of this

23  nature.  But once they put him in the pool of acceptable

24  anesthesiologists and then told him — and not just him — but

25  told people who wanted to use him, you can't do it.  Why?

1   Well, we have an exclusive.

2         One of the things that intrigued me about this case

3   was it's one of the first times in my life that I had had a

4   true insider, not just a doctor that did some work, or a guy

5   that -- but a guy that understood how it was put together and

6   knew, well, wait a minute, if this surgeon wanted this

7   anesthesiologist, we made an exception to the agreement.

8         Now, I think VHS's come back is, well, you know, why

9   should we make an exception to Shah?  Because of the volume of

10  work that he did, to not have made an exception for purposes

11  of health care.  We no longer care about the Shah agreement.

12  Mr. Rogers is correct about that.  We went out there.  They

13  fought the good fight.  It is on appeal, but both the court

14  and counsel are aware of appealing arbitration awards.

15        But what I'm saying is the conduct we're talking

16  about now flows through that, to the point where STAR is gone,

17  Shah is there, children are sick, surgeons need Shah.  And we,

18  not only did we plead that, but we attached their letters,

19  their emails, their entreaties, "please let me use Dr. Shah."

20  So to go back to the court's question, I think I survive on my

21  antitrust claim relatively easily in terms of market and harm.

22        One of the things I've always liked about our British

23  colleagues, however, is that at certain points I think you

24  have an obligation to point to the court where your adversary

25  might be correct on something, and I think we can resolve the

1   Tenet issue by me doing that.

2          There is a case that I found.  I apologize it was not

3   in my first brief, but it's *Lenox McLaren versus Medtronic*

4   *Inc.*, and I've got a copy for the Court.  May I approach?

5          THE COURT:  Yeah; thank you.

6          MR. WEITZ:  *Lenox* is a February 7th, 2017 Tenth

7   Circuit opinion.  For our purposes what matters is Headnote

8   15, which is actually on page 15 of the document.  And I'll

9   just tell the court basically what it says is this:  In a

10  Sherman Section 1 claim, you do have to have specific facts

11  that tie your Honor to Mr. Weitz, Mr. Weitz to Mr. Rogers, in

12  terms of a concerted conspiracy effort.

13         But when it comes to a Section 2 Sherman claim, I

14  don't have to do that.  And this case speaks to the notion of

15  a single enterprise.  And what it says is that the person at

16  the top of the food chain can be brought in simply because

17  everybody below him may have engaged in that.  So while I

18  agree with Mr. Rogers that a Section 1 claim may have a

19  difficult time holding Tenet, a Section 2 claim clearly does.

20         And, just a brief history, Tenet got brought in

21  because apparently at some point in the whole reorganization

22  structure, the entity that my client had dealt exclusively

23  with almost, a subsidiary, at some point sort of ceased to

24  exist.

25         So I went back to the top of the chain, listed Tenet,

1  VHS Partners, and then everybody below that.  But in a

2  nutshell, that's how I survive the Sherman claim.

3          THE COURT:  And the tortious interference?

4          MR. WEITZ:  You don't have a right to create a

5  contract that basically violates federal antitrust law.  And

6  if you look at the pleading, the only thing that the defendant

7  seems to be arguing that I'm missing is the wrongful act.

8          The wrongful act is required for an existing

9  contract.  I believe I have that.  Because, like I said, there

10  was no justification for the STAR contract to have allowed

11  VHS, whatever, to have used it to basically deprive Shah of

12  his ability to work under circumstances where the main issue

13  was proper medical care.  So my wrongful act is the antitrust.

14          Unless the court has further questions, I'll —

15          THE COURT:  No; thank you.  So where are we at on the

16  discovery process?

17          MR. WEITZ:  We have complied with all the court's

18  orders.  We have had our 26(a) conference.  We have exchanged

19  26(a) disclosures.  Shah is in the process of putting a

20  request for production together, and I'm sure Mr. Rogers is

21  probably doing the same thing.

22          THE COURT:  So it's going to take me weeks before I'm

23  able to draft an order on this, but the verbal order is:  The

24  motion to dismiss the first amended complaint is denied.

25  There is enough here to establish, at least on the basis of

1  the pleadings, the claims that have been asserted that all the

2  elements have the sufficient amount of meat to the bones.

3       This is really an issue for summary judgment.  And

4  so, you know, I don't know whether you get past, you know,

5  this, but there is, you know, the whole issue of the viable

6  market and all of that.  I mean, that's been alleged, and so

7  now we're going to need evidence if you're going to still

8  argue that claim as to why this is not a viable market.

9  That's not proper for 12(b) purposes.  We're really needing to

10 argue a 56 motion.

11      So we are going to exchange discovery depositions of

12 who?

13      MR. WEITZ:  Contemplated depositions, obviously of

14 the parties.  We may need a deposition of somebody from STAR,

15 just so we can understand how the exclusivity aspect went from

16 there.  And we've also — and, like I said, we're

17 preliminarily trying to figure this out, but I believe there

18 is going to a deposition from someplace called Tejas, which

19 was the de minimis anesthesiology provider.  At this moment,

20 those are the only ones I can think of.

21      THE COURT:  From your perspective, what do you see?

22      MR. ROGERS:  At the risk of stepping back a step, the

23 case that they relied on in terms of the relevant market not

24 being appropriate for a motion to dismiss was a motion to

25 dismiss case based on a relevant market, *Concord Associates*,

1  Second Circuit, 2016.

2          I think, your Honor, we are presented with some

3  challenges in terms of the scope of discovery in this matter.

4  Ostensibly the relevant market is defined as all Level III and

5  Level IV NICUs where pediatric anesthesiology services were

6  provided, but I think there is an alternative market that's

7  more general.  Perhaps — they are level — obviously they're

8  Level I and Level II NICUs, but, as well, there are general

9  anesthesiology services in distinguishing that.

10          THE COURT:  So let me suggest this.  I mean, if you

11 think you are so right on that, and that's wholly dispositive

12 of this, should we tier discovery just to tee up the issue of

13 relevant market?

14          MR. ROGERS:  And injury.  I would like to consider

15 that, your Honor, and present some proposals to Mr. Weitz and

16 we'll come back to you with a suggestion if we can reach an

17 agreement, or if we can't.

18          THE COURT:  So, I mean, if you are dead set that

19 that's going to be successful, then, you know, why don't the

20 two of you talk about trying to tier discovery.  Let's look at

21 tiering up — teeing up a motion for summary judgment, just on

22 the issues of relevant market and injury, and then find out

23 whether or not those are dispositive, and then we continue on

24 from there.

25          MR. WEITZ:  I think that's a prudent way to proceed.

```
1           THE COURT:  Okay.  Well, let's go forward on that
2   basis and I'll let you work out the details.
3       (Concludes proceedings.)
4                           o0o
5                       CERTIFICATE
6   I, Gigi Simcox, RMR, CRR, Official Court Reporter for the
7   United States District Court, Western District of Texas, do
8   hereby certify that the foregoing is a true and correct
9   transcript, to the best of my ability and understanding, from
10  the record of the proceedings in the above-entitled and
11  numbered matter.
12
                    s/Gigi Simcox, RMR, CRR
13                  Gigi Simcox, RMR, CRR
                    Official Court Reporter
14
15
16
17
18
19
20
21
22
23
24
25
```