**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **JAYDEEP SHAH, M.D. M.A.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. SA-18-CA-0751-XR** |
| | § | |
| **TENET HEALTHCARE CORPORATION,** | § | |
| **TENET HEALTHCARE LTD., VHS SAN** | § | |
| **ANTONIO PARTNERS LLC D/B/A** | § | |
| **NORTH CENTRAL BAPTIST HOSPITAL** | § | |
| **ET. AL., GRAHAM REEVE; DANA** | § | |
| **KELLIS; and WILLIAM WAECHTER,** | § | |
| | § | |
| **Defendants.** | § | |

<u>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

Christopher A. Rogers
Texas Bar No. 24051264
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Tel: (214) 651-5000
Fax: (214) 651-5940
chris.rogers@haynesboone.com

**ATTORNEY FOR DEFENDANTS**

# <u>TABLE OF CONTENTS</u>

Introduction ..................................................................................................................1

Factual Background ........................................................................................................2

Summary Judgment Standard .........................................................................................6

Legal Standard for Antitrust Claims ...............................................................................7

Arguments and Authorities .............................................................................................8

I.      Plaintiff Does Not Have Standing to Assert an Antitrust Claim .........................9

II.     Plaintiff Fails to Properly Define a Cognizable Relevant Market ....................12

III.    Plaintiff Fails to Prove Damage to His Relevant Market—i.e., Harm to
        Competition ....................................................................................................18

        A.      Proof of harm to the market (i.e., harm to competition) is a necessary
                component of a Sherman Act claim ..........................................................19

        B.      Plaintiff fails to allege any theory or provide any evidence of any effect—
                much less a market-wide effect on competition—outside BHS. ...........20

        C.      Plaintiff makes no attempt to prove antitrust harm through traditional
                means—i.e., an increase in price or reduction in output ........................22

        D.      Plaintiff presents insufficient evidence to conclude that competitive harm
                occurred as a consequence of diminished quality of pediatric anesthesia
                services in his proposed relevant market. ...............................................23

        E.      Plaintiff's purported exclusion from non-BHS facilities is not attributable
                to Defendants. .........................................................................................26

IV.     Plaintiff's Tortious Interference Claim Falls with Plaintiff's Antitrust Claim. ................27

Conclusion and Prayer ................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)............................................................................................6

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
  300 F.3d 620 (5th Cir. 2002) .............................................................................13

*Baglio v. Baska*,
  940 F. Supp. 819 (W.D. Pa. 1996), *aff'd*, 116 F.3d 467 (3d Cir. 1997) .................................12

*Bailey v. Allgas, Inc.*,
  284 F.3d 1237 (11th Cir. 2002) ..........................................................................18

*BCB Anesthesia Care, Ltd. v. Passavant Mem'l Area*,
  36 F.3d 664 (7th Cir. 1994) ...............................................................................11

*Benson v. St. Joseph Reg'l Health Ctr.*,
  2007 WL 7120757 (S.D. Tex. Mar. 22, 2007)......................................................8, 10, 11, 19

*Benson v. St. Joseph Reg'l Health Ctr.*,
  575 F.3d 542 (5th Cir. 2009) .............................................................................8, 11

*Brunswick Corp. v. Pueblo Bowl-O-Mat*,
  429 U.S. 477 (1977)............................................................................................9

*California Dental Ass'n v. Fed. Trade Comm'n*,
  224 F.3d 942 (9th Cir. 2000) .............................................................................25

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)............................................................................................6

*Cohlmia v. Ardent Health Servs., LLC*,
  448 F. Supp. 2d 1253 (N.D. Okla. 2006) .............................................................11

*Collins v. Assoc. Pathologists, Ltd.*,
  844 F.2d 473 (7th Cir. 1988) .............................................................................21

*D'Onofrio v. Vacation Publ'ns, Inc.*,
  888 F.3d 197 (5th Cir. 2018) .............................................................................27

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
  123 F. 3d 301 (5th Cir. 1997) ............................................................................8, 9, 13, 20

*Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*,
   684 F.2d 1346 (7th Cir. 1982) ........................................................................21

*Ezpeleta v. Sisters of Mercy Health Corp.*,
   621 F. Supp. 1262 (N.D. Ind. 1985), *aff'd*, 800 F.2d 119 (7th Cir. 1986)..............11

*Fed. Trade Comm'n v. Freeman Hosp.*,
   69 F.3d 260 (8th Cir. 1995) ...........................................................................14

*Fed. Trade Comm'n v. Ind. Fed'n of Dentists*,
   476 U.S. 447 (1986)......................................................................................19

*Flegel v. Christian Hosp., Ne.-Nw.*,
   4 F.3d 682 (8th Cir. 1993) .............................................................................24

*Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.*,
   76 F.3d 1245 (1st Cir. 1996)............................................................................6

*Ginzburg v. Mem'l Healthcare Sys.*,
   993 F. Supp. 998 (S.D. Tex. 1997) ........................................................... *passim*

*GSI Tech. v. United Memories, Inc.*,
   2014 WL 1572358 (N.D. Cal. Apr. 18, 2014) ......................................................11

*Heart v. Virtual Health, Inc.*,
   2015 WL 1321674 (D.N.J. Mar. 24 2015), *aff'd*, 833 F.3d 399 (3d. Cir. 2016) ...................26

*Jefferson Parish Hosp. Distr. No. 2 v. Hyde*,
   466 U.S. 2 (1984).........................................................................................26

*Johnson v. Hosp. Corp. of Am.*,
   95 F.3d 383 (5th Cir. 1996) ..................................................................8, 19, 23

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*,
   61 F. 3d 123 (2d Cir. 1995)............................................................................26

*Korshin v. Benedictine Hosp.*,
   34 F. Supp. 2d 133 (N.D.N.Y. 1999)................................................................12

*Lambert v. Bd. of Com'rs of Orleans Levee Dist.*,
   2009 WL 152668 (E.D. La. Jan. 22, 2009).........................................................7

*Lantec, Inc. v. Novell, Inc.*,
   306 F.3d 1003 (10th Cir. 2002) .......................................................................17

*Mahmud v. Kaufmann*,
   607 F. Supp. 2d 541 (S.D.N.Y. 2009), *aff'd*, 358 F. App'x 229 (2d Cir. 2009)....................21

*Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)................................................................................6, 23

*McLaughlin Equip. Co., Inc. v. Servaas*,
    2004 WL 1629603 (S.D. Ind. Feb. 18, 2004) ............................................2

*Norris v. Hearst Tr.*,
    500 F.3d 454 (5th Cir. 2007) ....................................................................12

*Pierson v. Orlando Reg'l Healthcare Sys., Inc.*,
    619 F. Supp. 2d 1260 (M.D. Fla. 2009), *aff'd*, 451 F. App'x 862 (11th Cir. 2012)...............21

*Pilch v. French Hosp.*,
    2000 WL 33223382 (C.D. Cal. Apr. 28, 2000) .......................................11

*Procaps S.A. v. Patheon Inc.*,
    141 F. Supp. 3d 1246 (S.D. Fla. 2015), *aff'd*, 845 F.3d 1072 (11th Cir. 2016)......................25

*Ragas v. Tennessee Gas Pipeline Co.*,
    136 F.3d 455 (5th Cir. 1998) ......................................................................7

*Reazin v. Blue Cross & Blue Shield of Kan.*,
    899 F.2d 951 (10th Cir. 1990) ..................................................................20

*Robles v. Humana Hosp. Cartersville*,
    785 F. Supp. 989 (N.D. Ga. 1992) ...........................................................12

*Seidenstein v. Nat'l Med. Enter., Inc.*,
    769 F.2d 1100 (5th Cir. 1985) ..................................................................21

*Shah v. Star Anesthesia, P.A.*,
    580 S.W.3d 260 (Tex. App.—San Antonio 2019, no pet.)..................4, 28

*Smith v. Ben Taub Hosp.*,
    2017 WL 991703 (S.D. Tex. Mar. 13, 2017)............................................2

*Star Anesthesia, P.A. v. Shah*,
    2018 WL 3520044 (224th Dist. Ct., Bexar County, Tex. June 12, 2018) ..........................4, 28

*Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*,
    309 F.3d 836 (5th Cir. 2002) ........................................................12, 14, 15

*Traffic Scan Network v. Winston*,
    1995 WL 317307 (E.D. La. May 24, 1995)..............................................2

*TravelPass Grp., LLC v. Caesars Ent. Corp.*,
    2019 WL 5691996 (E.D. Tex. Aug. 29, 2019) .........................................7

*Turner v. Baylor Richardson Med. Ctr.*,
476 F.3d 337 (5th Cir. 2007) ....................................................................................7

*United States v. Brown Univ. in Providence in State of R.I.*,
5 F.3d 658 (3d Cir. 1993)........................................................................................22

*United States v. E.I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956)................................................................................................13

*United States v. Solinger*,
457 F. Supp. 2d 743 (W.D. Ky. 2006) ....................................................................11

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)............................................................................................8, 19

*Water Craft Mgmt., L.L.C. v. Mercury Marine*,
361 F. Supp. 2d 518 (M.D. La. 2004), *aff'd*, 457 F.3d 484 (5th Cir. 2006) ..........18

*Wood v. Archbold Med. Ctr., Inc.*,
738 F. Supp. 2d 1298 (M.D. Ga. 2010) ..................................................................25

*Zenith Radio Corp. v. Hazeltine Res. Inc.*,
395 U.S. 100 (1969)..................................................................................................9

*Zoellner v. St. Luke's Reg'l Med. Ctr., Ltd.*,
2012 WL 2326070 (D. Idaho June 19, 2012) ........................................................22

## Statutes

15 U.S.C. § 1 .................................................................................................................7

15 U.S.C. § 2 .................................................................................................................7

15 U.S.C. § 15 ...............................................................................................................7

## Other Authorities

Erin C.F. Brown, *Resurrecting Health Care Rate Regulation*, 67 HASTINGS L.J. 85 (2015)........11

FED. R. CIV. P. 56................................................................................................................6

TEX. ADMIN. CODE §177.17 .................................................................................................2

Defendants Tenet Healthcare Corporation, Tenet Healthcare, Ltd., VHS San Antonio Partners, LLC d/b/a Baptist Health System d/b/a North Central Baptist Hospital, Graham Reeve, Dana Kellis, and William Waechter (collectively, "Defendants") file this Motion for Summary Judgment and respectfully request the Court dismiss Plaintiff's First Amended Complaint (the "Complaint") in its entirety for the reasons provided below.

## INTRODUCTION

Plaintiff Dr. Jaydeep Shah ("Dr. Shah") brings antitrust and tortious interference claims against Defendants based on termination by his former group, STAR Anesthesia, P.A. ("STAR"), and his resulting exclusion from practicing in the Baptist Health System ("BHS") pursuant to the pediatric anesthesiology coverage agreement between BHS and STAR—of which Dr. Shah had been the primary beneficiary for over a decade.  Over the past ten months, the parties have engaged in discovery on the definition of the relevant market and the antitrust harm caused to that relevant market.  Dr. Shah now would doubtless like to convince the Court that this case involves complex issues of law and fact that require further discovery.

Although this case arises from the health care industry and a messy dissolution of a longstanding relationship between an anesthesiologist, an anesthesiology group, and a hospital network, this Motion only requires the Court to address three issues:

1.   Can Dr. Shah—as his own expert—prove the existence of a relevant product market for "pediatric anesthesia services" without any quantitative evidence or economic analysis?

2.   Can Dr. Shah—as his own expert—prove that an antitrust injury occurred without performing any quantitative analysis or showing any impact outside BHS?

3.   Can Dr. Shah—as his own expert—prove that the market was competitively harmed when the alleged conduct only excluded him from BHS?

Dr. Shah concedes he did **no empirical analysis** to reach his conclusions about the relevant market, antitrust injury, or competitive harm in this case.  He concedes that his only evidence of antitrust injury or competitive harm **relates only to BHS, not to the market-at-large**.  Instead of measuring competitive harm based on increases in price or decreases in output, Dr. Shah relies on a generalized allegation of diminished quality (only at BHS) based on surgeon dissatisfaction with STAR's alternatives in the six months following his departure.  Based on clear Fifth Circuit precedent, far greater evidence is required to prove antitrust claims.  Whether Dr. Shah's opinion testimony survives Defendants' motion to exclude, Defendants are entitled to summary judgment on all of Dr. Shah's claims as a matter of law.[1]

## FACTUAL BACKGROUND

Despite the complexities of the health care industry, one fundamental transaction underlies all others in health care: a patient receives health care services and then pays for those services. The patient is the "consumer," although referring physicians can and do influence the choice of provider, medical procedure, or hospital.  And the doctor is the provider of that care.  In fact, the provision of care from a doctor to a patient is so sacrosanct that Texas, like some other states, observes the "corporate practice of medicine" doctrine, which requires that health care services

---

[1] If the Court grants Defendants' Motion to Exclude Plaintiff's Expert Testimony, summary judgment in favor of Defendants is appropriate because Plaintiff has presented no other evidence to oppose this Motion for Summary Judgment.  *See McLaughlin Equip. Co., Inc. v. Servaas*, 2004 WL 1629603, at *6–9, *18, *20, *23 (S.D. Ind. Feb. 18, 2004) (striking plaintiff's expert's opinions regarding the relevant product and geographic markets and market power because they were "unsupported by sufficient facts or data and lacking in a reliable methodology," and holding that the expert's opinions were therefore insufficient to establish or raise a genuine issue as to the elements of plaintiff's antitrust claims); *Traffic Scan Network v. Winston*, 1995 WL 317307, at *7 (E.D. La. May 24, 1995) ("[E]xpert testimony without a factual foundation cannot defeat a motion for summary judgment. When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict. . . . [E]xpert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them.").

provided to patients are provided by physicians, nurses, and other health care providers—not by hospitals, companies that own and operate hospitals, or corporate executives like Defendants.[2]

At times, a hospital may face a shortage of specialized physicians.  Dr. Shah alleges such a shortage existed for anesthesiologists who could administer anesthesia to pediatric patients in Bexar County, Texas.  *See* **Exhibit 1** (Deposition of Jaydeep Shah) at App. 29, 108:3–6.  To address such shortages, a hospital or hospital operator may offer financial incentives to specialists to move into the community and practice medicine there.

Here, Defendant North Central Baptist Hospital ("NCBH") entered into an agreement with STAR in 2005 under which STAR agreed to provide anesthesia services.  In 2006, NCBH and STAR amended the agreement such that Dr. Shah was named the hospital's Director of Pediatric Anesthesiology and Perioperative Services and, to address the aforementioned shortage, the hospital granted STAR exclusivity over the provision of anesthesia services and contractually guaranteed STAR's overall collections for a given year.  Dkt. No. 7, Ex. 1.  For pediatric anesthesia specifically, NCBH guaranteed STAR $500,000 in collections each year.  *Id*.  In 2012, the agreement between NCBH, STAR, and Dr. Shah was subsumed into an overall agreement for anesthesiology coverage between BHS and STAR, under which STAR would be the exclusive provider of anesthesiology services at four hospitals operated by BHS, including NCBH.  *Id*.

The agreements' pediatric income guarantee provision did not name Dr. Shah specifically. Nonetheless, Dr. Shah served as the *de facto* pediatric anesthesia resource related to that contractual guarantee from its inception in 2006 until 2016.  *Id*. ¶ 11.  As a partner in STAR, he

---

[2] *See, e.g.*, TEX. ADMIN. CODE §177.17(a) ("The corporate practice of medicine doctrine is a legal doctrine, which generally prohibits corporations, entities or non-physicians from practicing medicine."); *Smith v. Ben Taub Hosp.*, 2017 WL 991703, at *2 (S.D. Tex. Mar. 13, 2017) (explaining that "the practice of medicine is restricted to licensed physicians, and there is no 'corporate practice of medicine' recognized in Texas," and holding "plaintiff's allegations of what 'the hospital' did or did not do for his injury fails to state a claim, as [defendant-hospital] did not, and could not, practice medicine"), *appeal dismissed*, 2017 WL 4417853 (5th Cir. June 5, 2017).

both provided a majority of the services STAR was obligated to perform under its pediatric anesthesia coverage commitment and received the majority of the compensation paid pursuant to the related pediatric anesthesia guarantee. *See* Ex. 1 at App. 33–34, 134:23–135:2 ("[E]arly on, I was probably doing 80 to 90 percent [of pediatric cases at NCBH]. And as we continued to grow and build that volume of things, I would say I probably was still doing near the end at least about 30 to 35 percent of those cases."); *id.* at App. 35, 136:11–12 ("I took the lion share of the call."); *id.* at App. 36, 159:7–8 ("I did 600 cases a year, one-third of volume alone, . . .").

In 2016, STAR and BHS amended their coverage agreement to, among other things, remove the pediatric income guarantee. *See* Dkt. No. 7, Ex. 5. The need to contractually guarantee income for providers of pediatric anesthesia no longer made business sense because BHS understood that its facilities' pediatric anesthesia needs would be covered even without a contractually guaranteed minimum collection amount. Shortly thereafter, STAR terminated Dr. Shah. *See id.*, Ex. 4. An arbitrator—in an arbitration that did not involve any of the Defendants in this case—ruled that STAR was within its contractual rights to terminate the partnership agreement between STAR and Dr. Shah. *See* **Exhibit 2** (Final Award in *Dr. Jaydeep Shah v. Star Anesthesia, PA*, AAA Case No. 01-17-0000-9956 (Mar. 6, 2018)) at App. 68–73. The arbitrator's decision has since been upheld by a district court and appellate court. *See Shah v. Star Anesthesia, P.A.*, 580 S.W.3d 260 (Tex. App.—San Antonio 2019, no pet.); *Star Anesthesia, P.A. v. Shah*, No. 2018-CI-04393, 2018 WL 3520044 (224th Dist. Ct., Bexar County, Tex. June 12, 2018).

With his partnership agreement terminated, Dr. Shah no longer enjoyed the benefits of the exclusive coverage agreement between NCBH and STAR. After obtaining reappointment to the BHS medical staff, Dr. Shah requested that NCBH grant him an exception under the exclusivity agreement so that he could practice there. *See* Dkt. No. 7, Exs. 18, 19. The hospital declined.

A patient choosing to undergo a pediatric surgery at NCBH or another BHS facility—whether before or after Dr. Shah's termination—has but one choice for an anesthesia provider: STAR.  *See* Dkt. No. 7, Exs. 1, 5.  If anything, patients (and patients' surgeons) have a greater range of options after Dr. Shah's termination, as there are now 11 STAR anesthesiologists with special privileges from BHS to provide anesthesia to pediatric patients.  *See* **Exhibit 3** (Defendants' Response to Plaintiff's Requests for Production Nos. 6 and 7) at App. 74.  Yet, Dr. Shah alleges that his termination by STAR and exclusion from NCBH and other BHS facilities have harmed competition in the entire market for pediatric anesthesia services[3] in Bexar County and surrounding counties.  *See* Dkt. No. 7 ¶¶ 46, 51–59, 65.  Dr. Shah does not, however, allege or attempt to prove any impact on that overall market using traditional metrics for assessing competitive impact.  He admits that he offers no evidence whatsoever about the prices or quantity of pediatric anesthesia services in his relevant market before or after his termination.  *See infra* Part III(C).  Nor does he offer any measurements or quantifiable data about the quality of anesthesia services before or after his termination.  *See infra* Part III(D).

Instead, the only evidence that Dr. Shah puts forward to characterize any circumstances as giving rise to his antitrust claim are (1) statements from a few surgeons who used Dr. Shah for anesthesiology services prior to his termination by STAR that—in the six months after Shah's departure—they were unhappy with scheduling for anesthesia procedures for pediatric patients at NCBH; and (2) Dr. Shah's observation that some pediatric surgical cases were handled by physicians who are not qualified to perform pediatric anesthesiology, as Dr. Shah defines the term.  *See* Ex. 1 at App. 65, 237:13–237:22.

---

[3] As explained in this Motion, Dr. Shah has been repeatedly unclear on what he considers to be the market for "pediatric anesthesia services."  But he has been clear that the market includes hospitals other than, and larger than, BHS.  *See* Ex. 1 at App. 15–16, 68:13–69:16.

Based on these observations, Dr. Shah alleges that he has standing to bring an antitrust suit against BHS and some of its current and former executives for the allegedly anticompetitive effect of BHS's and STAR's actions. But Dr. Shah is wrong for several reasons, explained in greater detail below, and Defendants' Motion for Summary Judgment should be granted.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where there is no genuine issue of material fact. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The summary judgment movant must demonstrate the absence of a genuine issue of material fact by either (1) submitting summary judgment evidence that negates the existence of a material element of plaintiff's claim or (2) showing there is no evidence to support an essential element of plaintiff's claim. *Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir. 1996); *see Celotex Corp.*, 477 U.S. at 322–23. A fact is "material" if its resolution in favor of one party might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 48–49 (1986). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party. *Id*. If the evidence rebutting the motion for summary judgment is only colorable or not significantly probative, summary judgment should be granted. *Id*.

Under Rule 56(c), the movant bears the initial burden of informing the court of the basis for its belief that there is an absence of a genuine issue for trial, and for identifying those portions of the record that demonstrate such absence. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Where the movant has met this burden, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id*. (citations omitted). In meeting this requirement, the non-movant must "identify specific

evidence in the record" and "articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). "[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citation omitted).

## LEGAL STANDARD FOR ANTITRUST CLAIMS

Section 4 of the Clayton Act gives private parties, such as Dr. Shah, the power to enforce federal antitrust laws. *See* 15 U.S.C. § 15(a) ("[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor."). Here, Dr. Shah purports to bring federal antitrust claims pursuant to Sections 1 and 2 of the Sherman Act. Section 1 of the Sherman Act prohibits, among other things, "contract[s]" or a "conspiracy" "in restraint of trade or commerce," 15 U.S.C. § 1, while § 2 prohibits the "monopoliz[ation], or attempt to monopolize . . . trade or commerce," *id*. § 2.

To pursue such claims, a plaintiff must demonstrate not only that it has constitutional standing, but also that it has antitrust standing. *TravelPass Grp., LLC v. Caesars Ent. Corp.*, 2019 WL 5691996, at *11 (E.D. Tex. Aug. 29, 2019), *report and recommendation adopted*, 2019 WL 4727425 (E.D. Tex. Sept. 27, 2019). Antitrust standing is a "judicially-created set of threshold requirements that a private plaintiff must show before a court can entertain its antitrust claims." *Id*. It involves "more than the 'case or controversy' requirements of constitutional standing." *Lambert v. Bd. of Com'rs of Orleans Levee Dist.*, 2009 WL 152668, at *5 (E.D. La. Jan. 22, 2009) (citations omitted). Instead, antitrust standing requires plaintiffs to demonstrate: (1) an injury-in-fact, i.e., an injury to the plaintiff proximately caused by defendants' conduct; (2) an antitrust injury; and (3) that the plaintiff is a proper plaintiff and no other parties are better situated to bring

suit. *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F. 3d 301, 305 (5th Cir. 1997); *Ginzburg v. Mem'l Healthcare Sys.*, 993 F. Supp. 998, 1014 (S.D. Tex. 1997).

To prevail on a claim under Section 1 of the Sherman Act, a plaintiff must prove that a defendant (i) engaged in a conspiracy (ii) that produced some anticompetitive effect (iii) in the relevant market. *Benson v. St. Joseph Reg'l Health Ctr.*, 2007 WL 7120757, at *11 (S.D. Tex. Mar. 22, 2007) (citing *Johnson v. Hosp. Corp. of Am.*, 95 F.3d 383, 392 (5th Cir. 1996)), *aff'd*, 575 F.3d 542 (5th Cir. 2009). A Section 2 claim of monopolization requires (1) possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that monopoly power through anticompetitive conduct. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).

## ARGUMENTS AND AUTHORITIES

Summary judgment in favor of Defendants is appropriate for four reasons. *First*, Dr. Shah does not have antitrust standing because he cannot demonstrate an antitrust injury. There is no proof of quantifiable anticompetitive impact on prices, quality, or quantity of medical services, and Dr. Shah is not a proper plaintiff to seek recovery for the damages he alleges. *Second*, Dr. Shah fails to properly define a cognizable relevant market. He is unable to consistently define his relevant geographic or product markets, he has done no analysis and has no evidence to support his market-related contentions, and there was no data-driven effort to assess where consumers of pediatric anesthesia services would turn for alternatives. *Third*, Dr. Shah fails to prove damage to his relevant market—that is, harm to competition—because he does not allege, and there is certainly no evidence of, any effect on competition outside BHS. Even ignoring the lack of a market-wide effect, Dr. Shah makes no attempt to prove antitrust harm through traditional means such as an increase in price or reduction in output, and there is insufficient evidence of competitive

harm from diminished quality of pediatric anesthesia services in the proposed relevant market.

*Finally*, Dr. Shah's tortious interference claim falls with his antitrust claim.

## I.     Plaintiff Does Not Have Standing to Assert an Antitrust Claim

Dr. Shah does not have antitrust standing because he cannot demonstrate an antitrust injury.

"Antitrust injury" is an injury:

> of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.  The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.  It should, in short, be "the type of loss that the claimed. . . violations would be likely to cause."

*Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489 (1977) (quoting *Zenith Radio Corp. v. Hazeltine Res. Inc.*, 395 U.S. 100, 125 (1969)).

There is a distinction between antitrust injury for standing purposes and injury to competition, which is a component of substantive antitrust liability.  *See Doctor's Hosp. of Jefferson*, 123 F.3d at 305.  Antitrust injury for standing purposes "should be viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition."  *Id*.  A plaintiff need not establish a market-wide injury to competition as an element of standing.  *Id*.  The standing inquiry asks merely whether the plaintiff's alleged losses fall within the conceptual bounds of antitrust injury, regardless of the ultimate merits of the claim.  *Id*.  Mindful of this distinction, the Fifth Circuit has cautioned district courts against granting summary judgment on standing grounds when they really mean to say that no antitrust violation has occurred.  *See id*. at 306.

But this case is the "atypical antitrust case" where even if you assume Dr. Shah's facts and assertions to be correct, the harms he asserts do not fall within the conceptual bounds of antitrust injury.  *See id*.  Even Dr. Shah recognizes that his own exclusion is not the type of injury the antitrust laws were designed to prevent.  *See* Ex. 1 at App. 20, 82:14–18 ("Q. And so it only became

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**                                              **PAGE 9**

an antitrust injury when it was applied to you?  A. No, to Tejas as well. . . It's not to me. That's

not antitrust injury.").[4]

By his own admission, Dr. Shah only offers two pieces of evidence to support his assertion

of antitrust injury in this case:

- Complaints by NCBH physicians who used to refer to Dr. Shah regarding availability, scheduling, and qualifications of STAR anesthesiologists for no more than six months after his departure.  *See* Dkt. No. 7, Exs. 12, 13, 37, 38, 39; Ex. 1 at App. 65, 237:13–237:22.

- The fact that an indeterminate number of pediatric patients of various ages were cared for by anesthesiologists without board certification or other pediatric-specific qualifications at NCBH.  *See* Ex. 1 at App. 65, 237:13–22.

Despite ten months of discovery, Dr. Shah has made no effort to quantify the impact of the

alleged conduct on price, availability, quantity, or quality of pediatric anesthesia services before

and after his departure.  *See* Ex. 1 at App. 14, 51:1–3 ("Q. Did you perform any empirical analysis

for purposes of your opinion in the case?  A. I did not."); *id*. at App. 23, 87:20–23 ("Q. [T]here is

no study performed or analysis of a quantifiable effect on quality care or consistency, correct?  A.

Correct."); *id*. at App. 31, 111:18 ("I have not done an analysis of the shortage [of pediatric

anesthesiologists]"); *id*. at App. 66–67, 242:25–243:3 ("Q. [W]e can't test your math because there

has been no data analysis, correct?  A. That is correct. You can't -- I have not done any math.").

Without some proof of an antitrust injury "of the type the antitrust laws were designed to

prevent," he has failed to demonstrate an antitrust injury that would confer standing over this

---

[4] Dr. Shah claims several times that the basis of his antitrust claim is that both he and Tejas Anesthesia ("Tejas"), another anesthesia group operating in San Antonio, were excluded from BHS.  Whether or not Dr. Shah has standing to assert Tejas's claim or is a proper party to press claims on behalf of Tejas, he concedes that the Tejas anesthesiologists did—and continue to—provide pediatric anesthesia services at hospitals in the relevant market.  Ex. 1 at App. 27–28, 105:17-106:4.  They have no antitrust injury for Dr. Shah to pursue.  *See Benson*, 2007 WL 7120757, at *11 (S.D. Tex. Mar. 22, 2007) (finding no "adverse effect on competition in the market as a whole" where patients could still be treated by physician-plaintiff at alternate locations and, if they wanted to be treated at defendant-hospital, could choose from several physicians with privileges there).

dispute.   Courts have repeatedly dismissed or granted summary judgment over a terminated physician's antitrust claims where there was no proof of quantifiable anticompetitive impact on prices, quality, or quantity of medical services.  *See Benson v. St. Joseph Reg'l Health Ctr.*, 575 F.3d 542, 549 (5th Cir. 2009) ("The inability to service patients at the hospital of his choice does not demonstrate an unreasonable adverse impact . . . for the entire county.").[5]

Dr. Shah's evidence of "antitrust injury" makes it clear that he is not a proper plaintiff to seek recovery for the damages he alleges.  Whether the proper antitrust consumer in this context is the referring surgeon, as Dr. Shah contends,[6] or the patient, as the weight of legal and academic authority recognizes,[7] the fact that Shah's departure caused scheduling issues and temporary difficulties staffing cases with board-certified pediatric anesthesiologists for six months would be a harm suffered by the patients and their surgeons, not by Dr. Shah.

Courts have repeatedly held that physician-plaintiffs like Dr. Shah do not have antitrust standing in similar circumstances.  *See e.g.*, *Benson*, 2007 WL 7120757, at *10 (explaining that

---

[5] *See also BCB Anesthesia Care, Ltd. v. Passavant Mem'l Area*, 36 F.3d 664, 667–68 (7th Cir. 1994) (collecting 28 cases and noting that "[t]he cases involving staffing at a single hospital are legion. . . . Those hundreds or thousands of pages almost always come to the same conclusion: the staffing decision at a single hospital was not a violation of section 1 of the Sherman Act"); *United States v. Solinger*, 457 F. Supp. 2d 743, 760–61 (W.D. Ky. 2006) ("[A] decision by a hospital to terminate a single doctor's privileges simply does not result in the type of injury to competition that the antitrust laws were designed to prevent."); *GSI Tech. v. United Memories, Inc.*, 2014 WL 1572358, at *3 (N.D. Cal. Apr. 18, 2014) ("While eliminating one player from a market will certainly cause injury to the eliminated party, that injury is not 'of the type the antitrust laws were intended to prevent,' so long as other participants are not harmed and competition remains in the market.") (citations omitted).

[6] *See* **Exhibit 4** (Plaintiff's Rebuttal Expert Report) at App. 76, 80; Ex. 1 at App. 24, 95:15–16; Ex. 1 at App. 38, 171:5; Ex. 1 at App. 44, 194:21–22; Ex. 1 at App. 55, 223:2–5.  *But see* Ex. 1 at App. 4, 12:11–12 ("The injuries are to consumer choice in the matter, by proxy patient choice . . .").

[7] *See, e.g.*, *Cohlmia v. Ardent Health Servs., LLC*, 448 F. Supp. 2d 1253, 1265 (N.D. Okla. 2006) (acknowledging that patients are "the consumers in th[e] market" for surgical services); *Ezpeleta v. Sisters of Mercy Health Corp.*, 621 F. Supp. 1262, 1268 (N.D. Ind. 1985) (in antitrust suit brought by terminated anesthesiologist, explaining that the patient is the "consumer or buyer wishing to purchase the service of surgery . . . [and the related] service of anesthesiology"), *aff'd*, 800 F.2d 119 (7th Cir. 1986); *Pilch v. French Hosp.*, 2000 WL 33223382, at *7 (C.D. Cal. Apr. 28, 2000) (in antitrust suit brought by anesthesia provider, concluding that "there is no genuine issue of fact that the relevant service market is one in which patients are the consumers . . ."); *see generally* Erin C.F. Brown, *Resurrecting Health Care Rate Regulation*, 67 HASTINGS L.J. 85 (2015) (discussing health care prices and spending from the perspective of patients as the consumers of health care services).

"patients, insurance companies, or the government would all be better situated" than plaintiff to bring suit for conduct that allegedly decreased patient choice and increased prices), *aff'd*, 575 F.3d 542 (5th Cir. 2009); *Ginzburg*, 993 F. Supp. at 1020 ("Assuming . . . [that] the decrease in quality of care provided to [hospital] patients and the reduction in patient choice options has in fact occurred, then it would be [the hospital's] patients and the third party payors, not [plaintiff], who are actually injured by Defendants' allegedly unlawful conduct."); *Korshin v. Benedictine Hosp.*, 34 F. Supp. 2d 133, 140 (N.D.N.Y. 1999) (dismissing anesthesiologist's antitrust claims and explaining that "patients, referring physicians, and third-party payers, and the government would be more 'efficient enforcers' of the antitrust laws because they have stronger interests in ensuring that prices, services, quantity and quality remain at competitive levels."); *Baglio v. Baska*, 940 F. Supp. 819, 830 (W.D. Pa. 1996) (holding that plaintiff-physician did not have antitrust standing as "patients and the larger payor community . . . must bring an action on their own behalf" for conduct that allegedly increased patients' costs), *aff'd*, 116 F.3d 467 (3d Cir. 1997); *Robles v. Humana Hosp. Cartersville*, 785 F. Supp. 989, 999 (N.D. Ga. 1992) (same).

For these reasons, the Court must grant summary judgment as to Dr. Shah's antitrust claim for lack of antitrust injury and antitrust standing.  *See Norris v. Hearst Tr.*, 500 F.3d 454, 467–68 (5th Cir. 2007) (affirming summary judgment as all plaintiffs lacked antitrust injury and standing).

## II.     Plaintiff Fails to Properly Define a Cognizable Relevant Market

Any antitrust claim must define the relevant market allegedly affected by the defendants' unlawful conduct.  *See Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*, 309 F.3d 836, 839–40 (5th Cir. 2002).   The relevant market has two components—a geographic market and a product or service market—and it is in those markets where a court must assess the effect upon competition, if any.  *See Ginzburg*, 993 F. Supp. at 1012. The relevant product market is "composed of products [or services] that have reasonable

interchangeability for purposes for which they are produced." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956). "[E]vidence must be offered demonstrating not just where consumers currently purchase the product, but where consumer could turn for alternative products or sources of the product." *Doctor's Hosp. of Jefferson*, 123 F.3d at 311. Once determined, the product market serves to define the geographic market, which is "the area of 'effective competition'" for the product in question and which "must be charted by careful selection of the market area in which the seller operates and to which buyers can practicably turn for supplies." *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 626 (5th Cir. 2002).

Here, Dr. Shah's only complaint is that he was excluded from practicing specifically at the BHS facilities covered under BHS's exclusive agreement with STAR. Ex. 1 at App. 16, 69:14–16 ("Q. But the only exclusion that you're claiming is exclusion from the Baptist Health System? A. Yes."). But "every court that has addressed this issue has held or suggested that, absent an allegation that the hospital is the only one serving a particular area or offers a unique set of services, a physician may not limit the relevant geographic market to a single hospital." *Ginzburg*, 993 F. Supp. at 1013 (citations omitted); *see also Apani*, 300 F.3d at 628 (explaining that a relevant market is legally insufficient if it "does not encompass all interchangeable substitute products")

Dr. Shah, cognizant of the fact that courts have repeatedly held single-hospital markets to be legally insufficient for antitrust purposes, attempts to build a relevant geographic market containing not just BHS, but also some—but not all—of the other locations where pediatric anesthesia services might be rendered. In his discovery responses and expert reports, he declares the relevant geographic market to be "Bexar County and the seven contiguous counties" based on comparisons to the geographic market for hospital inpatient services. **Exhibit 5** (Plaintiff's Designation of Tier 1 Expert) at App. 109, 112; Ex. 1 at App. 3, 11:16–18; Ex. 1 at App. 48, 200:5–

6.  But Dr. Shah did not perform any analysis whatsoever to determine whether the appropriate geographic market for pediatric anesthesia services was the same as or different than the relevant geographic market for inpatient hospital services.  He also relies on uncontested allegations in an unrelated case—about the market for employment and compensation of nurses—to justify his definition of the relevant geographic market.  *See* Ex. 4 at App. 101; Ex. 5 at App. 110.  But again, Dr. Shah presents no evidence and has done no analysis to support his contention that the relevant geographic market for employment of nurses is the same as the relevant geographic market for the provision of pediatric anesthesiology services.  *See Surgical Care Ctr. of Hammond*, 309 F.3d at 840 (finding plaintiff's expert's definition of the relevant geographic market was improper because he did not attempt to identify competing hospitals or clinics and therefore did not analyze where people could practicably go for the services at issue); *Fed. Trade Comm'n v. Freeman Hosp.*, 69 F.3d 260, 270–72 (8th Cir. 1995) (holding that in the absence of economic or statistical data indicating geographic market, district court was justified in refusing to credit market participant testimony that did not address where consumers could turn for alternatives).

Dr. Shah's definition of the relevant product market is even more deficient.  His expert reports inconsistently state that the product market is "pediatric anesthesiology" (Ex. 5 at App. 110, 113), "pediatric anesthesiology services" (Ex. 4 at App. 82), and "medical services of pediatric anesthesiologists" (Ex. 4 at App. 81).

Notwithstanding the inconsistent verbiage, Dr. Shah was unable to define his product market in deposition and his testimony made it clear he had done no analysis and had no evidence to support his contentions.  Dr. Shah first stated that his product market was "pediatric anesthesia services."  Ex. 1 at App. 3, 11:21–22.  But he then said at  his deposition that his "product market is related to pediatric hospitals."  *Id*. at App. 5, 32:2–6.  The term "pediatric hospitals" was not

defined in his complaint, expert report, or rebuttal report, but Dr. Shah claimed it includes six BHS facilities, Methodist Children's Hospital ("Methodist"), and CHRISTUS Children's Hospital of San Antonio ("CHOSA").[8]  *Id*. at App. 7, 34:20–35:1; *id*. at App. 8, 35:18–22.  However, Dr. Shah curiously excluded University Hospital (an academic facility) and San Antonio Military Medical Center ("SAMMC") from his definition of the relevant product market even though he acknowledged that both facilities are "pediatric hospitals" within his geographic market and both "provide anesthesia services to pediatric patients."  *See id*. at App. 49, 204:25–205:16.  He also acknowledged that there is nothing preventing patients from selecting a surgeon at those facilities. *Id*. at App. 54, 211:20–24.  Dr. Shah's only explanation for their exclusion is that he himself could not practice medicine there without becoming employed by either hospital.  *See id*. at App. 51, 206:18–207:14; *id*. at App. 53, 208:1–6.  Dr. Shah provides no justification for defining the relevant product market for the purchase of pediatric anesthesia services based on where he is presently eligible to or inclined to work.  Simply put, there is none.

In addition, Dr. Shah inexplicably excluded non-hospital environments where pediatric anesthesia services are rendered, including hospital-run outpatient surgery centers (even those operated in medical office buildings on hospital campuses) and ASCs ***where he has rendered those services himself***.  *See id*. at App. 5, 32:21–33:12 ("You can't consider pediatric anesthesia that's delivered in a hospital setting because hospitals cannot be compared to outpatient surgery centers or offices or off-site independent standing GI suites or MRI centers . . ."); *id*. at App. 9, 42:3–46:23 (admitting that he has "provided outpatient services to patients in other settings like

---

[8] This statement conflicts with Dr. Shah's Complaint, which alleges that NCBH is the "only comprehensive pediatric hospital in north San Antonio."  Dkt. No. 7 ¶ 52.  The Complaint attempts to group NCBH with Methodist and CHOSA by alleging that they are the only "civilian, non-academic, high-acuity NICUs, PICUs, and dedicated Pediatric ERs in San Antonio."  *Id*. ¶ 31.  But, as explained in this Motion, Dr. Shah provides no evidence to support that description as the definition of the relevant product market.

ambulatory surgery centers," "the hospitals could have performed that specific care had they chosen to do so," and hospitals and ambulatory surgery centers are competitors for "select and specific cases," but nonetheless excluding those services from his definition of the relevant product market); *id*. at App. 37, 166:17–21 ("Q. And so would the services that you provided at those ambulatory surgery centers be included in your definition of this relevant product market that -- as you described it?  A. No."); *see also* Ex. 4 at App. 82, 84, 89 (arguing that Defendants' expert erred in including ASCs in the definition of the relevant product market).  Dr. Shah offered no explanation grounded in economics or quantitative assessment for this exclusion.

Dr. Shah further compounded the problems with his product market definition by claiming it was limited to services performed by board-certified providers, despite acknowledging that in some instances a pediatric patient could appropriately receive anesthesia services from a non-certified provider.  *Compare* Ex. 1 at App. 41, 183:4–11 ("Q. Is your definition of the relevant product market in this case limited to cases where pediatric anesthesia services were provided to a pediatric patient by a board certified or equivalent pediatric anesthesiologist? In other words, are you excluding pediatric cases performed by non-certified, non-privileged anesthesiologists for -- for pediatrics?  A. In the hospital setting, yes.") *with id*. at App. 42–43, 192:23–193:13 ("Q. If a general anesthesiologist provides services to a pediatric patient in a hospital environment inside your geographic market, is that in or out of your product market, and why?  A. In your hypothetical world where there are no privileging requirements, it would be in the market. . . . Because it's pediatric anesthesia services. Because the patient is a pediatric person, but it's not being delivered by a pediatric anesthesiologist.").  Again, Dr. Shah offered no explanation grounded in economics or quantitative assessment for this exclusion.

Finally, nowhere in his complaint, expert report, or rebuttal report does Dr. Shah define what he considers to be a "pediatric" patient. *See id*. at App. 45, 195:16–25 ("Can you point me to where in your complaint or your expert reports you defined the age of the patient for purposes of pediatric anesthesiology?  A. I don't."). He ultimately concluded, during deposition, that it would vary hospital by hospital and would be the age defined in a hospital's privileging or credentialing requirements for pediatric anesthesiology. *Id*. at App. 44, 194:5–14 ("In your defined product market of pediatric anesthesiology services, how old are these patients?  A. It depends on the privileging. But in Baptist, I believe when they came out with their credentials, it was six and under.  Q. So it's dependent on the privileging requirements hospital by hospital by hospital?  A. Generally speaking, with the caveat that pediatric surgeons work with pediatric anesthesiologists."). He offers no evidence about what those age requirements may be, and he has no justification for asserting a relevant product market definition that varies by individual facility.

The only thing that the deposition made clear is the fact that Dr. Shah has not performed any analysis of the type the law requires. He did not put himself in a patient's shoes for either his relevant geographic market or his relevant product market to determine where alternatives for pediatric anesthesia services (or even pediatric surgical services) might be sought. *See, e.g.*, Ex. 1 at App. 46–47, 198:20–199:22 (excluding SAMMC from his definition of the relevant market because some providers may be limited from working there, but acknowledging that SAMMC provides services to pediatric patients and admitting that he had not analyzed the percentage of participants in the market that could choose SAMMC as option to receive health care services). And he makes no data-driven effort to assess where consumers of pediatric anesthesia services would turn for alternatives. The law is clear that such analysis is required.[9]  In short, Dr. Shah

---

[9] *See, e.g.*, *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1025 (10th Cir. 2002) (affirming exclusion of an expert because, among other things, he did not understand the product or the product's market, testified the relevant market was

presents no evidence to allow the court to conclude that the relevant geographic market is Bexar County and the seven contiguous counties, or that the relevant product market is "pediatric anesthesia services" that he argues (a) varies hospital-to-hospital, (b) excludes hospitals based on Dr. Shah's perception about his own ability to work there, and (c) excludes non-hospital practice locations where Dr. Shah has administered pediatric anesthesia services.  For these reasons, there is no genuine issue of material fact as to Dr. Shah's antitrust claim because there is no evidence to support his definitions of the relevant market—an essential element of Dr. Shah's claim.

Because Dr. Shah failed to present sufficient evidence to adequately define a relevant market, summary judgment in favor of Defendants as to Dr. Shah's antitrust claim is appropriate.

## III.    Plaintiff Fails to Prove Damage to His Relevant Market—i.e., Harm to Competition

Proof of harm to the market—that is, harm to competition—is a necessary component of Dr. Shah's claim, whether he intends to proceed under Section 1 or Section 2 of the Sherman Act. However, Dr. Shah concedes that he presents no evidence of traditional anticompetitive effects such as increased prices or decreased output.  He also did not choose to present circumstantial evidence of harm to competition based on monopoly power in a relevant market where barriers to entry make competitive harm more likely.

Rather, Dr. Shah relies on an argument that a decrease in alternatives and decrease in quality occurred in the relevant market, as he has defined it.  But this argument fails because Dr. Shah (1) fails to allege or prove a decrease in alternatives in the relevant market; (2) completely

---

determined by consumer purchasing patterns but did not conduct or cite surveys revealing consumer preferences, and did not calculate the cross-elasticity of demand to determine which products were substitutes); *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1246–47 (11th Cir. 2002) (finding an expert's testimony insufficient because he failed to analyze substitutes for the relevant product, conduct surveys of homes in the geographic area, or determine the cross-elasticity of the product); *Water Craft Mgmt., L.L.C. v. Mercury Marine*, 361 F. Supp. 2d 518, 544 (M.D. La. 2004) (finding plaintiffs' expert did not properly establish a relevant geographic and product market because he did not examine where consumers were purchasing the product, did not consider substitute products, and did not consider competing sellers of the product), *aff'd*, 457 F.3d 484 (5th Cir. 2006).

ignores price or output, the traditional hallmarks of antitrust; (3) presents no reliable expert opinion or other evidence showing an impact on quality in the relevant market; and (4) shows by his arguments that his only real complaint is harm to himself as a single competitor excluded from a single hospital system—precisely the type of harm that has been repeatedly deemed not among those the antitrust laws were designed to prevent.

### A. Proof of harm to the market (i.e., harm to competition) is a necessary component of a Sherman Act claim.

To prevail on a claim for unreasonable restraint of trade under Section 1 of the Sherman Act, a plaintiff must prove that a defendant (i) engaged in a conspiracy (ii) that produced some anticompetitive effect (iii) in the relevant market.  *Benson*, 2007 WL 7120757, at *10 (citing *Johnson*, 95 F.3d at 392).  A Section 2 claim of monopolization requires (1) possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that monopoly power through anticompetitive conduct.[10]  *Verizon Commc'ns*, 540 U.S. at 407.

In deciding whether the allegedly unlawful conduct of defendants produces some anticompetitive effect, courts apply the "rule of reason," a framework that helps determines whether the restraint imposed is one that merely regulates, or perhaps even promotes, competition in the relevant market or one that may suppress or even destroy competition.  *Fed. Trade Comm'n v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986).  Under this framework, a plaintiff must prove a defendant's activities, on balance, adversely affected competition in the relevant market.

---

[10] It is questionable if Dr. Shah's Complaint asserts a Section 2 claim.  Beyond a conclusory statement in ¶ 63, the Complaint does not outline the elements of a Section 2 claim or provide supporting allegations for each element.  But assuming *arguendo* that Dr. Shah is asserting a Section 2 claim, summary judgment in favor of Defendants is appropriate because Dr. Shah has not provided any evidence of Defendants' market share, market power, or anticompetitive conduct.  *See infra* Part III(B).  As a practical matter, Dr. Shah concedes that BHS is only the second- or third-largest provider of pediatric anesthesia services and he presents no evidence to contest Professor Maness's observation that it provided no more than 9% of the pediatric anesthesia services in the relevant market in any relevant year.  *See infra* Part III(B).

*Doctor's Hosp.*, 123 F.3d at 307.  The adverse effect must be on competition in general, and "not just 'on any individual competitor or on plaintiff's business.'" *Ginzburg*, 993 F. Supp. at 1009 (quoting *Reazin v. Blue Cross & Blue Shield of Kan.*, 899 F.2d 951, 960 (10th Cir. 1990)).

> **B.     Plaintiff fails to allege any theory or provide any evidence of any effect—much less a market-wide effect on competition—outside BHS.**

BHS operates six hospitals in or near San Antonio.  **Exhibit 6** (Defendants' Designation of Phase 1 Expert and Robert Maness's Expert Reports) at App. 147 ¶ 16; Ex. 6 at App. 224 ¶ 16. Dr. Shah alleges that he was excluded from all six BHS hospitals when STAR refused him a subcontract after his partnership agreement was terminated.  *See* Ex. 1 at App. 15, 68:1–5; *id.* at App. 21–22, 83:11–84:1.  He alleges that Tejas was similarly excluded from BHS facilities.  *Id.* at App. 20, 82:14–18; Dkt. No. 7 ¶¶ 45, 52, 64, 65.

Dr. Shah presents no evidence, however, of any impact on pediatric anesthesia services outside the BHS network.  He admits that BHS, put together, is only the second or third largest provider of pediatric surgery services in his relevant market.  *See* Ex. 1 at App. 15–16, 68:13– 69:16.  And Defendants' expert, economist Professor Rob Maness, estimated pediatric anesthesia procedures at BHS never exceeded 9% of the overall market (patient ages 0 to 16) in any relevant year.  Ex. 6 at App. 247 ¶ 77.  Dr. Shah even acknowledges that multiple hospitals—Methodist, CHOSA, University Hospital, and SAMMC—provide reasonably comparable surgical services and reasonably comparable pediatric anesthesia services.  *See* Ex. 1 at App. 49–51, 204:25–206:2; *id.* at App. 54, 211:20–24.  Nonetheless, all of Dr. Shah's personal observations and expert opinions alleging anticompetitive effects are limited to NCBH or, at most, BHS.  Dr. Shah collected no data from other facilities and he received no information from physicians pertaining to pediatric anesthesia services at facilities outside BHS.  Ex. 1 at App. 57–58, 229:11–230:2 ("Q. There is no information in those documents about the quality of medical care provided at facilities

other than Baptist facilities, is there?  A. In the surgeon's depositions, no.  Q. So you have no information about the provision of medical care and whether the quality of medical care at facilities, other than Baptist, has changed? . . . Q. You've not studied that, measured it; you have no information? . . . A. No.").  Dr. Shah even conceded in his deposition that market share was relevant to the consideration of competitive harm in this case.  Ex. 1 at App. 59, 231:16–21.

Courts have repeatedly and resoundingly rejected plaintiffs' attempts to assert impact on a single-hospital market, except in the exceedingly rare circumstance of an otherwise remote, single-hospital community or in the case of highly specialized, non-substitutable health care services. *Ginzburg*, 993 F. Supp. at 998; *see also Collins v. Assoc. Pathologists, Ltd.*, 844 F.2d 473, 480 n. 5 (7th Cir. 1988) (stating that plaintiff-physician was "slicing the geographic market much too thin" in limiting the market to one hospital); *Seidenstein v. Nat'l Med. Enter., Inc.*, 769 F.2d 1100, 1106 (5th Cir. 1985) (finding that there was no evidence to prove that the hospital should be "recognized as a separate and distinct market, or that unique services or facilities existed there"); *Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*, 684 F.2d 1346, 1353 (7th Cir. 1982) (stating that "we have reason to doubt whether the relevant market can be sliced so small as to embrace only a single hospital"); *Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, 619 F. Supp. 2d 1260, 1280 (M.D. Fla. 2009) (rejecting "Plaintiff's attempt to narrow the relevant market to one hospital"), *aff'd*, 451 F. App'x 862 (11th Cir. 2012).

Thus, without any evidence that competition at the other non-BHS hospitals was affected by some action by Defendants, Dr. Shah has not demonstrated a market-wide harm to competition. *See Mahmud v. Kaufmann*, 607 F. Supp. 2d 541, 558 (S.D.N.Y. 2009) (granting summary judgment in favor of defendants as to plaintiff-cardiologist's antitrust claims because the plaintiff failed to provide evidence demonstrating that competition as a whole was harmed), *aff'd*, 358 F.

App'x 229 (2d Cir. 2009); *cf. Zoellner v. St. Luke's Reg'l Med. Ctr., Ltd.*, 2012 WL 2326070, at

*3 (D. Idaho June 19, 2012) (dismissing anesthesiologist's antitrust claims because he failed to

allege "how his elimination from the marketplace injured competition generally").

     **C.**    **Plaintiff makes no attempt to prove antitrust harm through traditional means—i.e., an increase in price or reduction in output.**

     The traditional markers of antitrust injury are reduction in output or increase in price

beyond the level that would be dictated by healthy competition. *See United States v. Brown Univ.*

*in Providence in State of R.I.*, 5 F.3d 658, 668 (3d Cir. 1993) (citations omitted). But Dr. Shah

concedes that he makes no effort to perform any analysis—qualitative or quantitative—of impact

on price or output in his relevant market. *See* Ex. 1 at App. 17, 71:17–20 ("Q. You didn't perform

any scientific tests of the effect of those numbers of cases on prices either at Baptist or in the

greater relevant market? A. No."); *id*. at App. 23, 87:5–8 ("Q. You didn't do any studies or analysis

at this point that there were increases in patient care related costs? A. I did not do any studies.");

*id*. at App. 29, 108:11–12 ("Q. Did you look at prices? A. No."); *id*. at App. 29–30, 108:13–109:10

("Q. Did you look at quantity of services? . . . A. I did not do an analysis."); *id*. at App. 38, 171:9–

15 ("Q. [Y]ou have not measured or compared prices or costs of pediatric anesthesiology services

before and after your exclusion from the market, have you? A. For the purposes of my expert

opinion and rebuttal, no."); *id*. at App. 39–40, 178:22–179:1 ("Q. Is there any data that shows that

the quantity of pediatric anesthesiology services went down in your absence? A. I did not do any

math. I relied on what the surgeons said in their written depositions."); *id*. at App. 40, 179:9–13

("Q. But you don't have any data yourself that shows that the volume or quantity went down? A.

. . . I wasn't asked to quantify that prior to coming here.").

     In addition, Dr. Shah's argument that BHS competes in the relevant market for pediatric

anesthesia services or that it seeks to drive up prices or drive down output or competitors in that

market "makes no economic sense." *See* Ex. 6 at App. 221–22 ¶ 10, App. 243 ¶ 65.  BHS is not a competitor in the relevant market for pediatric anesthesia services; it does not buy or sell pediatric anesthesia services. *Id.*  Those services are rendered to patients by anesthesiologists, like Dr. Shah, and then paid for by patients or their insurance plans.  BHS, as a hospital provider, has an economic interest in seeing its surgical facilities be at high volume and providing the highest quality of care as possible. *Id.* at App. 243 ¶ 65.  An increase in price or decrease in quality of ancillary services, such as anesthesiology, would negatively affect the hospital's productivity and reduce its overall revenues and profits. *Id.*  BHS is not a competitor of Dr. Shah, but its interests are aligned with its patients—providing the highest possible quality of health care service at the lowest possible cost. *Id.* at App. 221–22 ¶ 10, App. 242 ¶ 64, App. 243 ¶ 65, App. 247 ¶ 77; *see Johnson*, 95 F.3d at 393 (affirming dismissal of terminated physicians' antitrust claims and explaining that where defendants "had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy") (quoting *Matsushita Elec.*, 475 U.S. at 596–97).

### D.    Plaintiff presents insufficient evidence to conclude that competitive harm occurred as a consequence of diminished quality of pediatric anesthesia services in his proposed relevant market.

Ultimately, all of Dr. Shah's arguments that competition was harmed by Defendants' conduct boil down to this: surgeons who previously used Dr. Shah at BHS were temporarily dissatisfied with the alternatives initially provided by STAR to fill the need for pediatric anesthesia coverage at BHS in the wake of Dr. Shah's abrupt termination and departure.  But this alleged impact on quality of care fails to provide sufficient evidence to reach any conclusion about whether a competitive harm occurred in the relevant market for two reasons.

*First*, Dr. Shah has no quantifiable evidence to support his allegations of an impact on quality.  He only has a few physician complaints about scheduling, availability, and objections to

the use of non-board certified pediatric anesthesiologists for certain surgeries. But to constitute harm to competition, impact on quality must go beyond mere anecdotal, generalized assertions that patients would receive "better care" under an excluded physician's care. *See Flegel v. Christian Hosp., Ne.-Nw.*, 4 F.3d 682, 688–89 (8th Cir. 1993) (deeming affidavits of DOs asserting that patients would receive better care if treated by plaintiffs to be insufficient evidence of reduction in quality in the market). For example, the Seventh Circuit has found anecdotal evidence based on physician complaints unpersuasive. In *Kochert v. Greater Lafayette Health Services, Inc.*, the plaintiff presented "expert testimony and physician affidavits which rely almost exclusively on anecdotes, such as one story about an anesthesiologist leaving an operating room momentarily to eat a sandwich, to prove diminished quality." 463 F.3d 710, 719 (7th Cir. 2006). The court noted it had "serious doubts about the usefulness" of this anecdotal evidence, observing that the plaintiff had "not introduced any statistical analysis focused on measurable indices of quality, such as the number of patient complaints or mortality rates." *Id*. In other words, the plaintiff failed to present "any evidence that would allow a jury to compare the quality of care prior to defendants' anticompetitive acts with the quality of care after these acts." *Id.*

Here, too, Dr. Shah fails to do any such analysis. He did nothing to measure the quality of pediatric anesthesia services in the relevant market or even at BHS, and he presents no evidence of the quality of those services rendered at either before or after his departure. Ex. 1 at App. 18, 72:13–16 ("Q. Did you quantify anything with respect to those responses? Is there any datum around the number of quality issues that -- A. No, sir."); *id*. at App. 19, 74:9–14 ("Q. You don't know how to quantify quality issues for purposes of your opinions in this case? A. I cannot quantify that. Q. You did not quantify that for purposes of your opinions in this case? A. I did not."); *id*. at App. 23, 87:20–23 ("Q. [T]here is no study performed or analysis of a quantifiable

effect on quality care or consistency, correct?  A. Correct."); *id*. at App. 56, 228:10–14 ("Q. And you've not attempted to measure the impact of any of these events on the overall quality of pediatric anesthesia care provided in your relevant market?  A. I have not measured the number of complaints.").  He certainly does not provide any comparative quantitative evidence of the quality of care at BHS after his departure.  *Cf. Wood v. Archbold Med. Ctr., Inc.*, 738 F. Supp. 2d 1298, 1365 (M.D. Ga. 2010) (finding plaintiff's expert did not produce sufficient evidence of a reduction in quality of nephrology services where the "plaintiff (or his expert) has not produced any evidence that would allow the Court or a jury to compare the quality of care prior to his termination from the medical staff with the quality of care after.").  In short, Dr. Shah "did not do any math," as required in antitrust cases.[11]  Ex. 1 at App. 66–67, 242:25–243:3 ("Q. But we can't test your math because there has been no data analysis, correct?  A. That is correct. You can't -- I have not done any math.").

*Second*, Dr. Shah does not present any evidence of any sustained impact on quality at a market-wide level.  Instead, Dr. Shah is relying solely on complaints about quality that are limited to a six-month period at NCBH or, at most, within BHS.  He concedes that he has no evidence of a reduction in quality of services rendered outside BHS or more than six months after his departure.  *See* Ex. 1 at App. 57, 229:11–230:2 (conceding all information in regarding the quality of medical care is limited to BHS); *id*. at App. 60–65, 232:13–237:22 (conceding all evidence of the alleged impact on quality arises from the six months following Dr. Shah's departure from BHS).  Thus,

---

[11] *See, e.g.*, *California Dental Ass'n v. Fed. Trade Comm'n*, 224 F.3d 942, 958 (9th Cir. 2000) (concluding that the plaintiff failed to demonstrate substantial evidence of a net anticompetitive effect because the plaintiff "never quantified any increase in price or reduction in output" even though the "case law usually requires the antitrust plaintiff to show some relevant data from the precise market at issue"); *Procaps S.A. v. Patheon Inc.*, 141 F. Supp. 3d 1246, 1268 (S.D. Fla. 2015) (granting summary judgment in favor of the defendants in part because the plaintiff's expert "did not perform an empirical study" or find "empirically measurable evidence of higher prices, lower quality, poorer services, or lower quantities" and the plaintiff "did not quantify the actual competitive harm on any basis with any actual empirical evidence."), *aff'd*, 845 F.3d 1072 (11th Cir. 2016).

Dr. Shah has no evidence to conclude that there was a systematic, market-wide reduction in quality of pediatric anesthesia services throughout Bexar County during the time period alleged in this case.

In the absence of some reliable, scientific calculation, Dr. Shah's assertions of temporarily reduced quality in only part of his relevant market do not create a genuine issue of material fact to survive summary judgment.  *See K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F. 3d 123, 128 (2d Cir. 1995) (concluding "isolated statements of preference" by customers were "not a sufficient 'empirical demonstration concerning the [adverse] effect of the [defendants'] arrangement on price or quality.'") (quoting *Jefferson Parish Hosp. Distr. No. 2 v. Hyde*, 466 U.S. 2, 30 n.49 (1984)); *Heart v. Virtual Health, Inc.*, 2015 WL 1321674, at *11 (D.N.J. Mar. 24 2015) (granting motion for summary judgment because plaintiff "failed to provide direct evidence of actual anticompetitive effects in the relevant market as a whole" where plaintiff's evidence related only to referrals from one cardiology group comprising less than 8% of the relevant market), *aff'd*, 833 F.3d 399 (3d. Cir. 2016).

### E.      Plaintiff's purported exclusion from non-BHS facilities is not attributable to Defendants.

Dr. Shah knows that a claim that he was excluded from practicing pediatric anesthesiology at NCBH because of an exclusivity agreement between STAR and BHS cannot by itself give rise to an antitrust claim.  His contortions to characterize his limited evidence as showing market-wide harm to competition are in vain because they do not reflect commercial reality.

Dr. Shah could have chosen to practice at any number of other facilities in the Bexar County area following his termination by STAR.  *See* Ex. 1 at App. 32–33, 133:11–134:11 (admitting that he could have hypothetically practiced at non-BHS facilities).  No action by any Defendant precluded Shah from working anywhere other than BHS.  *See id*. at App. 25, 103:15–

19 ("Q. Your exclusion from [CHOSA] was a result of a contract between STAR and [CHOSA]? A. That is correct.  Q. To which Baptist is not a party?  A. That is correct."); *id.* at App. 26–27, 104:24–105:4 ("[T]he exclusivity provisions at [CHOSA] and at Methodist Children's were not exclusivity provisions to which Baptist or any of the parties in this litigation were a party to?  A. Correct.").  In other words, none of the actions outlined in the Complaint prevented Dr. Shah from offering anesthesia services at many other locations in the relevant market.  Even assuming *arguendo* that Defendants are responsible for Dr. Shah's exclusion, Dr. Shah has still failed to provide any evidence whatsoever of harm to competition.  *See supra* Parts III(B)–(D).

For these reasons, summary judgment in favor of Defendants as to Dr. Shah's antitrust claim is appropriate.

## IV.   Plaintiff's Tortious Interference Claim Falls with Plaintiff's Antitrust Claim.

Dr. Shah also asserts a claim of tortious interference, alleging that Defendants tortiously interfered with his existing business relationships with STAR, pediatric surgeons, and patients and caused his termination from STAR.  The elements of a claim of tortious interference with an existing business relationship are (1) an independent unlawful action undertaken without a legal right or justifiable excuse; (2) with intent to harm; and (3) actual damages.  *See D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 214–15 (5th Cir. 2018).  Here, Dr. Shah's counsel has conceded that the only unlawful action on which Dr. Shah's tortious interference claim is premised is the antitrust claim.  *See* **Exhibit 7** (Transcript of Jan. 10, 2019 Status Conference) at App. 306, 12:3–13.  Thus, Dr. Shah's failure to create a genuine issue of material fact as to all of the elements of his antitrust claim, as discussed above, also requires summary judgment in Defendants' favor as to his tortious interference claim.

In addition, Dr. Shah's tortious interference claim should be dismissed as a matter of law because a court has already rendered a final judgment on the merits of the claim.  After he was

terminated from STAR, Dr. Shah instituted an arbitration proceeding against STAR, alleging that STAR breached his Professional Service Agreement, breached its fiduciary duty to him, discriminated against him, and tortiously interfered with his professional agreements with BHS.  In March 2018, the arbitrator found in favor of STAR on all of Dr. Shah's claims.  In particular, the arbitrator rejected Dr. Shah's breach of contract and tortious interference claims, finding that STAR "had sufficient justification to terminate Dr. Shah for cause" and that there was "no credible evidence of tortious interference."  Ex. 2 at App. 71.  The District Court of Bexar County, 224th Judicial District, confirmed the arbitration award, and the confirmation was affirmed by the Court of Appeals for the Fourth Judicial District.  *See Shah v. Star Anesthesia, P.A.*, 580 S.W.3d 260 (Tex. App.—San Antonio 2019, no pet.); *Star Anesthesia, P.A. v. Shah*, No. 2018-CI-04393, 2018 WL 3520044 (224th Dist. Ct., Bexar County, Tex. June 12, 2018).  In other words, a court has already determined that Dr. Shah's termination from STAR and the dissolution of the relationship between Dr. Shah and STAR were the result of justified, legal action by STAR.

Thus, there is no basis for Dr. Shah to now assert a tortious interference claim based on those same facts against Defendants and the claim should be dismissed as a matter of law.

## CONCLUSION AND PRAYER

Defendants respectfully request that this Court grant this Motion and, for the reasons discussed herein, dismiss Plaintiff's First Amended Complaint and grant all other and further relief to which Defendants may be justly entitled.

Dated: November 18, 2019

*/s/ Christopher A. Rogers*
Christopher A. Rogers
Texas Bar No. 24051264
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Tel: (214) 651-5000
Fax: (214) 651-5940
chris.rogers@haynesboone.com

**ATTORNEY FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that, on November 18, 2019, the foregoing document was served upon all counsel of record via the Court's electronic filing system in accordance with the Federal Rules of Civil Procedure.

*/s/ Christopher A. Rogers*
Christopher A. Rogers