# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JAYDEEP SHAH, M.D. M.A., <br> *Plaintiff*, | § <br> § <br> § | |
| | § | SA-18-CV-00751-XR |
| v. | § <br> § | |
| VHS SAN ANTONIO PARTNERS LLC, <br> GRAHAM REEVE, DANA KELLIS, <br> M.D., WILLIAM WAECHTER, TENET <br> HEALTHCARE CORPORATION, <br> TENET HEALTHCARE LTD, <br> *Defendants*. | § <br> § <br> § <br> § | |

## ORDER

On this day, the Court considered Defendants' Motion for Summary Judgment (ECF No. 40), Plaintiff's Response (ECF No. 48), and Defendants' Reply (ECF No. 57). After careful consideration, the Court **GRANTS** summary judgment in favor of Defendants and issues the following Order.

## BACKGROUND

Plaintiff Jaydeep Shah, M.D. M.A. ("Dr. Shah") is a board-certified anesthesiologist who specializes in pediatric anesthesiology. In 2006, Dr. Shah joined San Antonio-based non-party STAR Anesthesia, P.A. ("STAR") as the Director of Pediatric Anesthesiology. In November 2007, Dr. Shah and STAR entered a "Professional Services Agreement" under which Dr. Shah became a full-partner and shareholder of STAR. *See* ECF No. 1-1 46–52.

During Dr. Shah's tenure with STAR, STAR entered into a series of agreements to become the exclusive provider of anesthesia services at four acute care hospitals in the San Antonio area run by Defendant Baptist Health System ("BHS"), including North Central Baptist Hospital

("NCBH").[1]   While practicing under his agreement with STAR, Dr. Shah also served as the Director of Pediatric Anesthesiology and Perioperative Services for NCBH.[2]   The initial agreement between STAR and BHS was renewed in 2010, and again in 2012 ("the 2012 STAR-BHS Agreement").   Under the 2012 STAR-BHS Agreement, there was a "pediatric income guarantee" which promised STAR at least $500,000 in collections for pediatric anesthesia services provided by STAR at NCBH.   ECF No. 1-1 34.   Dr. Shah was not a party to the 2012 STAR-BHS Agreement,[3] but he continued to serve in his role as Director with NCBH and to practice as a full-time pediatric anesthesiologist with STAR who benefitted from the group's STAR's guaranteed collections.

In November 2016, STAR and BHS negotiated to amend the 2012 STAR-BHS Agreement and to eliminate the $500,000 pediatric income guarantee.   As Dr. Shah puts it, the elimination of the income guarantee caused him to have "consternation" with STAR, "financially affected STAR's pediatric anesthesiologists," and resulted in "disarray" for the pediatric anesthesia coverage at NCBH.   ECF No. 7 ¶ 15.   In December 2016, as a result of the fallout from the elimination of the pediatric income guarantee between STAR and BHS, STAR terminated its relationship with Dr. Shah for cause after notice and hearing.[4]

---

[1] The four acute care hospitals set out in the 2012 STAR-BHS Agreement were Baptist Medical Center, Mission Trail Baptist Hospital, Northeast Baptist Hospital, and NCBH.   ECF No. 1-1 2.

[2] Dr. Shah's directorship with NCBH is memorialized in the 2012 STAR-BHS Agreement.   ECF No. 1-1 20 (naming Dr. Shah as NCBH's Director of Perioperative Anesthesia Department and describing his duties).

[3] Dr. Shah claims that he was a party to prior versions of the agreement entered in 2006 and renewed in 2010, and that he was the beneficiary of the pediatric income guarantee.   Defendants do not appear to dispute this, but no version of the agreement except the 2012 STAR-BHS Agreement appears in the record.   *See* ECF No. 7 ¶ 10 (Dr. Shah claiming that he "entered into an income guarantee agreement with STAR [and NCBH] but citing only to the 2012 STAR-BHS Agreement); *see also Shah v. Star Anesthesia, P.A.*, 580 S.W.3d 260, 262 (Tex. App.—San Antonio 2019, no pet.) (stating that Dr. Shah "entered into a contract in which Shah received guaranteed collections of $500,000 per year" that was amended in 2012 and that "Shah was not a party to the amended contract.")

[4] Pursuant to the terms of the Professional Services Agreement, on December 9, 2016 STAR sent Dr. Shah a notice of its intent to terminate the agreement for cause and suspended him from providing clinical services.   *See* ECF No. 1-1 58–59.   According to the notice, STAR's cause for terminating the agreement was "due to absolutely false statements [Dr. Shah] made to [NCBH] and its physician community asserting that STAR's pediatric anesthesia

In March 2017, writing as the "Chairman and Managing Partner" of the newly formed Children's Anesthesia of San Antonio, Dr. Shah sent a letter to Defendant Bill Waechter, the President of NCBH. ECF No. 1-2 at 73. Dr. Shah requested authorization to provide anesthesia care at NCBH, even though STAR continued to hold the contract with BHS as the exclusive provider of anesthesia services at NCBH. *Id.* In response, Defendant Graham Reeve, the President & CEO of BHS, wrote back that Dr. Shah's privileges to BHS were approved. ECF No. 1-2 at 75. However, Dr. Shah was still not allowed to provide pediatric anesthesia services at BHS facilities (including NCBH) because of the exclusivity agreement between BHS and STAR, since Dr. Shah was no longer affiliated with STAR.[5]

Dr. Shah sued STAR in Texas state court, alleging breach of contract, breach of fiduciary duty, fraud, and tortious interference. The dispute was submitted to binding arbitration, and the arbitrator issued a final award in STAR's favor, finding STAR's termination of Dr. Shah was within its contractual rights; that ruling was later twice upheld by Texas courts. *See Shah v. Star Anesthesia, P.A.*, 580 S.W.3d 260 (Tex. App.—San Antonio 2019, no pet.); *Star Anesthesia, P.A. v. Shah*, No. 2018-CI-04393, 2018 WL 3520044 (244th Dist. Ct., Bexar County, Tex. June 12, 2018).

A month after the Texas district court affirmed the arbitrator's award in STAR's favor, Dr. Shah filed the present suit against BHS and three of its officers—collectively "Defendants" herein. Dr. Shah brings two claims against Defendants for (1) tortious interference with a business

---

coverage is going away." *Id.* After a due process hearing was held on December 29, 2016, STAR's Board of Directors unanimously voted to terminate Dr. Shah's Professional Services Agreement with STAR. ECF No. 1-1 61.

[5] Dr. Shah repeatedly claims that the exclusivity agreement between BHS and STAR is not a legitimate basis for preventing him from practicing at NCBH because BHS made exceptions to its exclusivity agreement for other non-STAR anesthesiologists. Dr. Shah points to no reason in fact or law that an exception to exclusivity for others would make the exclusivity agreement non-enforceable as to himself.

relationship and (2) violations of Sections 1 and 2 of the Sherman Act. Defendants have moved

for summary judgment.

## DISCUSSION

**I.      Legal Standards**

   a.  <u>Summary Judgment Standard</u>

A court will grant summary judgment if the record shows there is no genuine issue as to

any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P.

56(a). The moving party bears the initial burden of informing the court of the basis for the motion

and of identifying those portions of the record which demonstrate the absence of a genuine issue

of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Adams v. Travelers Indem.*

*Co.*, 465 F.3d 156, 163 (5th Cir. 2006). To establish that there is no genuine issue as to any

material fact, the movant must either submit evidence that negates the existence of some material

element of the non-moving party's claim or defense, or, if the crucial issue is one for which the

non-moving party will bear the burden of proof at trial, merely point out that the evidence in the

record is insufficient to support an essential element of the non-movant's claim or defense.

*Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990).

Once the moving party meets this burden, the nonmoving party must "go beyond the

pleadings" and designate competent summary judgment evidence "showing that there is a genuine

issue for trial." *Adams*, 465 F.3d at 164; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

475 U.S. 574, 585–87 (1986). The parties may satisfy their respective burdens by tendering

depositions, affidavits, and other competent evidence. *Topalian v. Ehrman*, 954 F.2d 1125, 1131

(5th Cir. 1992). Mere conclusory allegations, unsubstantiated assertions, improbable inferences,

unsupported speculation, and hearsay evidence (unless within a recognized exception) are not

competent summary judgment evidence.  *Walker v. SBC Servs., Inc.*, 375 F. Supp. 2d 524, 535 (N.D. Tex. 2005) (citing *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994); *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995)).

In ruling on summary judgment, a court must view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in its favor.  *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  A court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

b.  Tortious Interference

In Texas, to establish tortious interference with an existing business relationship a plaintiff must prove (1) unlawful actions undertaken by the defendant without a legal right or justifiable excuse (2) with the intent to harm the plaintiff and (3) resulting in actual harm or damage.  *D'Onofrio v. Vacation Publications, Inc.*, 888 F.3d 197, 214–15 (5th Cir. 2018).

c.  Sherman Act Framework

The Sherman Act makes illegal "[e]very contract…or conspiracy, in restraint of trade or commerce" and any monopolization "or attempt to monopolize…any part of…trade or commerce."  15 U.S.C. §§ 1, 2.  Any person who is "injured in his business or property by reason of anything forbidden in the antitrust laws," including the Sherman Act, may bring suit to enforce those laws.  15 U.S.C. § 15(a).  However, a plaintiff must have antitrust standing to bring these claims, which requires the plaintiff to show (1) injury-in-fact, (2) antitrust injury, and (3) proper plaintiff status. *Suarez v. iHeartMedia + Entm't, Inc.*, No. SA-18-CV-1237-XR, 2019 WL 286186, at *2 (W.D. Tex. Jan. 22, 2019) (citing *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997)).

In addition to establishing antitrust standing, Section 1 of the Sherman Act requires a plaintiff to show that the defendants (1) engaged in a conspiracy (2) that restrained trade (3) in the relevant market. *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008); *see also MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 843 (5th Cir. 2015). Section 2 of the Sherman Act requires a plaintiff to show "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 891 (5th Cir. 2016) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).

## II.    Analysis

Defendants put forward four arguments in support of summary judgment in their favor. The Court will address each in turn.

### a.    Plaintiff's Antitrust Standing

Defendants argue that Dr. Shah's Sherman Act claims should be dismissed because he lacks antitrust standing for two reasons: (i) he cannot demonstrate an antitrust injury and (ii) he is not a proper plaintiff. Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977). "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* The requirement of proper plaintiff status "ensures that other parties are not better situated to bring suit." *Benson v. St. Joseph Reg'l Health Ctr.*, No. CIV.A.H-04-4323, 2007 WL 7120757, at *9 (S.D. Tex. Mar. 22, 2007), *aff'd*, 575 F.3d 542 (5th Cir. 2009).

Defendants assert that Dr. Shah's only evidence of any injury is complaints from NCBH physicians about difficulties with pediatric anesthesiology scheduling and qualifications after Dr.

Shah's departure and that some NCBH patients received care from anesthesiologists who were not board-certified or were not pediatric specialists, and that these are not injuries "of the type the antitrust laws were designed to prevent." ECF No. 40 at 10 (quoting *Brunswick*, 429 U.S. at 489). Defendants essentially argue that because Dr. Shah has put forward no proof of quantifiable anticompetitive impact on prices, quality, or quantity of medical services, he cannot establish antitrust standing. Defendants also argue that Dr. Shah is not the proper plaintiff to seek recovery for the damages he alleges. ECF No. 40 at 11. According to Defendants, both of the injuries Dr. Shah pleads—"scheduling issues and temporary difficulties staffing cases with board-certified pediatric anesthesiologists"—are harms "suffered by the patients and their surgeons, not by Dr. Shah." *Id.*

Dr. Shah responds that he "more than meets" the antitrust standing criteria and "his injury and that to the consuming public is both direct and closely tied to the anti-trust conduct at issue here"—namely, what Dr. Shah describes as the "tying arrangement"[6] in the 2012 STAR-BHS Agreement. Dr. Shah asserts that it is clear he was excluded and restrained from practicing his profession,[7] and cites to a Tenth Circuit case for the proposition that both "purchasers who are

---

[6] Dr. Shah claims that it is "undisputed" that the 2012 STAR-BHS Agreement constitutes an illegal "tying arrangement." ECF No. 48 ¶ 13. Defendants, obviously, dispute this allegation. A tying arrangement may unreasonably restrain trade in violation of the Sherman Act where two separate products are tied together and a competitor has used its market power to force consumers to accept the tied product. *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 18 (1984), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). However, the U.S. Supreme Court has held in similar circumstances that an exclusive coverage arrangement between a group of anesthesiologists and a hospital is not a per se violation of the Sherman Act. *Id.* at 28–29. Rather, these arrangements must be evaluated on whether or not they unreasonably restrain competition, which requires "an inquiry into the actual effect of the exclusive contract on competition among anesthesiologists." *Id.* at 29.

[7] Dr. Shah also claims throughout his pleadings that "nearly 70% of pediatric anesthesiologists" were excluded from practicing at BHS due to the exclusive coverage arrangement between BHS and STAR. In addition to himself, Dr. Shah includes the pediatric anesthesiologists of Tejas Anesthesia ("Tejas") in this allegation. Dr. Shah's allegations as to Tejas have no bearing on this lawsuit. Dr. Shah lacks standing to pursue claims on their behalf and is not the proper plaintiff to do so. And, summary judgment evidence shows that Tejas pediatric anesthesiologists continue to practice at non-BHS facilities included in Dr. Shah's proposed geographic market. ECF No. 38-1 105:17–106:4 (Q: "And Tejas continues to provide services in the relevant market?" A: "Yes.")

forced to buy the tied product…and the competitor who is restrained from entering the market for the tied product" both have antitrust standing. *Id.* ¶ 13 (citing *Sports Racing Servs., Inc. v. SCCA.*, 131 F.3d 874, 887 (10th Cir. 1997)).

The Court agrees with Defendants that this is the "atypical case" where, even taking all facts in the light most favorable to Dr. Shah and assuming he has demonstrated antitrust injury, he still lacks antitrust standing as the proper plaintiff to vindicate those injuries. Dr. Shah claims his exclusion from four BHS facilities caused antitrust injury to NCBH physicians who complained of availability and qualifications of STAR anesthesiologists and to patients who received services from STAR anesthesiologists who were not board-certified or pediatric specialists. Were both those injuries truly sustained, Dr. Shah would not be the proper plaintiff to pursue them; the physicians or patients themselves, or the government, would. *See Benson*, 2007 WL 7120757, at *1 ("patients, insurance companies, or the government would all be better situated to bring suit" than excluded physician alleging decreased patient choice and increased prices). Nevertheless, mindful of the Fifth Circuit's warning against granting summary judgment based on lack of antitrust standing, the Court will proceed to analyze the merits of Dr. Shah's claims. *See Doctor's*, 123 F.3d at 306 ("Although summary judgment could theoretically be based on standing, since without the showing necessary for an antitrust violation, a plaintiff cannot show that his injuries are of the type the antitrust laws were designed to prevent, the better path is to grant summary judgment for defendants on the merits."); *see also Benson*, 2007 WL 7120757 at *10 (assuming antitrust standing and proceeding "to analysis on the merits, because…both claims fail as a matter of law.")

b.  Plaintiff's Purported "Relevant Market"

Defendants next argue they are entitled to summary judgment because Dr. Shah's purported definition of the "relevant market" is insufficient as a matter of law.  ECF No. 40 at 12. A "relevant market" is an essential element to a Sherman Act claim: it is the pool a court must assess to determine the ripple effect of any purported antitrust conduct on competition.  *See Ginzburg v. Mem'l Healthcare Sys., Inc.*, 993 F. Supp. 998, 1011 (S.D. Tex. 1997) ("The relevant market is 'the…area that is affected by the questioned activity or operation, and it is in that market where the affect upon competition must be assessed.'").  "The 'market' which one must study" for antitrust purposes "is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956).  A relevant market for antitrust purposes has two components: a product market and a geographic market.  *Id.*  Both must be defined not just in terms of where the purportedly excluded competitor operates, but where consumers are affected by anticompetitive conduct and where they may turn for alternatives.  *Doctor's*, 123 F.3d at 311 ("evidence must be offered demonstrating not just where consumers currently purchase the product, but where consumers could turn for alternative products or sources of the product if a competitor raises prices."); *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 626 (5th Cir. 2002) ("The area of effective competition…must be charted by careful selection of the market area in which the seller operates and to which buyers can practicably turn for supplies.")

Dr. Shah proposes that the relevant product market for his antitrust claims is "pediatric anesthesia services"[8] in the geographic market of "Bexar County and the seven contiguous

---

[8] Dr. Shah uses various terms similar to "pediatric anesthesia services" (such as "pediatric anesthesiology," "pediatric anesthesia," and "pediatric anesthesiology services") interchangeably throughout his pleadings.  *See, e.g.*, ECF No. 48 ¶ 18.  Although Defendants point to these inconsistencies as another reason Dr. Shah's relevant market definition fails, the Court takes these semantics as differences without distinction.

counties." ECF No. 48 ¶¶ 18, 21. According to Defendants, both Dr. Shah's proposed product market and geographic market are fatally flawed.

First, Defendants argue Dr. Shah's product market is both under- and over-inclusive: when asked about what facilities are included in his proposed product market, he includes some "pediatric hospitals" in the San Antonio area that offer pediatric anesthesia services, but not all of them;[9] and he excludes other non-hospital environments where pediatric anesthesia services are rendered—including some where Dr. Shah himself has practiced.[10] Dr. Shah provides no reason for his selection of these facilities to include/exclude from his product market, other than that he himself could not practice at the excluded hospitals and that "hospitals cannot be compared to" other non-hospital settings where pediatric anesthesia services are provided. The geographic scope of his market definition is drawn from the geographic market for hospital inpatient services and from the market for employment and compensation of nurses. But Dr. Shah provides no evidence or reasoning that the geographic scope of the market for pediatric anesthesia services would be tied to these other two markets.

---

[9] In Dr. Shah's complaint, he alleges NCBH is the "only comprehensive pediatric hospital in north San Antonio." ECF No. 7 ¶ 52. He then groups NCBH with Methodist and CHOSA by alleging they are the only "civilian, non-academic, high-acuity NICUs, PICUs, and dedicated Pediatric ERs in San Antonio." *Id.* ¶ 31. In testimony when asked to list "pediatric hospitals" in the area as he defined the term in his relevant market proposed definition, he named BHS, Methodist, and CHOSA. ECF No. 38-1 33:22–35:1 (Q: "You just described a product market as relating to pediatric anesthesia services provided at a pediatric hospital." A: "Yes." Q: "When you use the words 'pediatric hospital' in that definition, how do you define a pediatric hospital for purposes of the relevant product market in this case? …what is the list of pediatric hospitals in your geographic market as you proposed it?" A: "[BHS]. The Methodist Children's Hospital, and the Children's Hospital of San Antonio.") Dr. Shah excludes two facilities raised by Defendants (University Hospital and San Antonio Military Medical Center) from his relevant market, even though he acknowledges both are "pediatric hospitals" within his geographic market that "provide anesthesia services to pediatric patients." *Id.* 204:25–205:16 (Q: "But do they provide anesthesia services to pediatric patients?" A: "They do." Q: "But they're not a pediatric hospital?" A: "They are, but not for the purposes of this suit…" Q: "If I'm going to get sedated, can I get sedated at University any differently than I can get sedated at Baptist or CHoSA or Methodist?" A: "Probably not.")

[10] Defendants propose that pediatric anesthesia services may be rendered at non-hospital environments such as hospital-run outpatient surgery centers and ambulatory surgery centers. ECF No. 40 at 15–16.

Dr. Shah does not offer any evidence to support his purported relevant market definition in terms of the actual <u>consumers</u> of pediatric anesthesia services. Instead, he proffers a definition of a market that revolves entirely around himself—a single competitor excluded from a single hospital system. *See* ECF No. 36-2 at 1–2 (defining "relevant geographic market" based on Dr. Shah's opinion "based upon [his] knowledge acquired from…providing pediatric anesthesia in the geographical market…serving as the BHS Regional Medical Director of Anesthesiology…participation on various BHS Committees…"); *id.* at 2–3 (defining "relevant product market" based on the same opinion evidence);[11] ECF No. 38-1 at 206:18–208:6 (acknowledging other area hospitals are viable alternatives for pediatric anesthesia patients but nevertheless excluding them from purported relevant market because some pediatric anesthesiologists are not eligible to work there and testifying the "relevant market is about where viability for a pediatric anesthesiologist to work is"); *see also* ECF No. 48 at 12 (arguing that Dr. Shah "served as the Director of the relevant product market that the Defendants themselves define in their agreement with STAR."); *id.* at 14 ("There are no facilities and therefore no jobs for pediatric anesthesiologists outside of Bexar county [sic] in the geographic market Dr. Shah has delineated.")

The Court agrees with Defendants, and with many other courts, that Dr. Shah's relevant market definition is insufficient as a matter of law. *See Apani*, 300 F.3d at 628 ("Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability…or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's

_____

[11] Dr. Shah designated himself as the sole testifying expert on both the relevant market and antitrust injury. ECF No. 36-2. Defendants moved to exclude Dr. Shah as an expert, arguing that his testimony is inadmissible under Federal Rule of Evidence 702. ECF No. 39. Even assuming Dr. Shah's opinions are admissible, they are insufficient to support his purported relevant market for the reasons stated herein.

favor, the relevant market is legally insufficient."); *Ginzburg*, 993 F. Supp. at 1013 ("[E]very court

that has addressed this issue has held or suggested that, absent an allegation that the hospital is the

only one serving a particular area or offers a unique set of services, a physician may not limit the

relevant geographic market to a single hospital") (collecting cases); *Surgical Care Ctr. of

Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*, 309 F.3d 836, 840 (5th Cir. 2002)

(finding proposed relevant market improper because expert did not attempt to identify competing

hospitals or clinics and therefore did not analyze where people could practicably go for the services

at issue). "Absent a showing of where people could practically go" for pediatric anesthesia

services, Dr. Shah has failed to meet his burden of presenting sufficient evidence[12] to define the

relevant market, and summary judgment against him is appropriate on this basis. *Surgical Care*,

309 F. 3d at 840 (affirming summary judgment against antitrust plaintiff hospital that failed to

define relevant geographic market).

### c. Plaintiff's Claimed "Damage" to the Relevant Market

Defendants also argue they are entitled to summary judgment on Dr. Shah's Sherman Act

claims because he cannot prove damage to the relevant market. According to Defendants, Dr.

Shah has admitted that he has no evidence of "traditional anticompetitive effects" such as increased

prices or decreased output, and he has also failed to present any circumstantial evidence of harm

to competition based on monopoly power. ECF No. 40 at 18. In Defendants' view, Dr. Shah relies

solely on a conclusory argument that "a decrease in alternatives and decrease in quality occurred

in the relevant market" without any competent summary judgment evidence of the same. *Id.* Dr.

Shah responds that he has established the existence of an antitrust injury by "direct evidence"—

---

[12] Dr. Shah argues that he "need not even show relevant market" under the "quick look" approach to antitrust cases
delineated by the Supreme Court. *See* ECF No. 48 ¶ 16 (citing *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999)).
As Defendants point out, the "quick look" abbreviation of the "rule of reason" test for whether an alleged restraint on
trade is unreasonable does not affect or diminish an antitrust plaintiff's burden to define the relevant market.

namely, that Dr. Shah as well as Tejas pediatric anesthesiologists were excluded from practicing under the plain terms of the 2012 STAR-BHS Agreement.[13] ECF No. 48 ¶ 24. Dr. Shah then goes on to describe what he calls BHS and STAR's "concerted effort to eliminate the ability of any pediatric anesthesiologist in San Antonio not under contract with STAR from providing care to children and neonates in BHS facilities." *Id.* ¶ 28.

In order to prevail on his Sherman Act claims, Dr. Shah must produce evidence of harm to the relevant market—that is, harm to competition, not just harm to himself.[14] *See Ginzburg*, 993 F. Supp. at 1009 ("[I]n order to sustain her burden of proof…the plaintiff must prove an adverse effect on competition in general, and not just 'on any individual competitor or on plaintiff's business.'") (internal citations omitted). The Court finds that Dr. Shah fails to meet his burden for two reasons.

First, it is questionable whether the summary judgment evidence Dr. Shah produced is competent or sufficient to meet his burden. As Defendants point out, throughout his briefing Dr. Shah cites to poorly labeled exhibits (without specifying page, paragraph, or line numbers), which were all filed separately from his briefing as various attachments, many of which are hundreds of pages long. By way of example, in order to illustrate the harm of decreased quality after Dr. Shah was excluded from BHS, he claims there were "numerous complaints from pediatric surgeons regarding their concerns about STAR's ability to appropriately manage pediatric anesthesia services in BHS." ECF No. 48 ¶ 28. In support, he cites to "Exhibit 7: Gowan's Depo Question

---

[13] For the reasons already stated, Dr. Shah's allegations as to purportedly excluded anesthesiologists from Tejas provide no support for his claims. *See supra* n.7.

[14] Section 1 requires a showing of a conspiracy that restrained trade (i.e. had some anticompetitive effect) in the relevant market. *See Golden Bridge*, 547 F.3d at 271; *Benson*, 2007 WL 7120757, at *10. Section 2 requires a showing of anticompetitive conduct with an intent to monopolize, or possession of monopoly power in the relevant market. *See Retractable Techs.*, 842 F.3d at 891; *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).

#21" and "Exhibit 10: #9." Neither Exhibit 7 nor Exhibit 10 are attached to Dr. Shah's response; instead, they can be found by rummaging through several docketed "attachments" with combined, non-labeled "exhibits." *See* ECF Nos. 48–51, 53–55. When one finds a document marked as "Exhibit 7" (ECF No. 49-2), it is an unorganized 49-page file containing the written deposition answers of four doctors and several other seemingly unrelated documents, none of which contain a deposition of "Gowan."[15] As this Court often observes, "Fed. R. Civ. P. 56 'does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'" *Chavez v. City of San Antonio*, No. SA-14-CV-527-XR, 2015 WL 5008466, at *8 (W.D. Tex. Aug. 19, 2015) (quoting *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)). Rather, once a defendant makes a properly supported motion for summary judgment, it is the plaintiff's burden to "identify specific evidence in the record…and articulate the precise manner in which that evidence supports his or her claim." *Chavez*, 2015 WL 5008466, at * 8 (citing *Spear Marketing, Inc. v. Bancorpsouth Bank*, 791 F.3d 586, 599 (5th Cir. 2015)). Dr. Shah's citations to his purported summary judgment evidence fail to meet this burden.

More fundamentally, though, even accepting all of Dr. Shah's (largely unsupported) allegations as true, he has only produced evidence of harm related to BHS facilities and thus has failed to produce any evidence of market-wide harm. In his response to Defendants' motion for summary judgment, Dr. Shah's evidence of harm exclusively relates to BHS facilities.[16] Dr. Shah

---

[15] Dr. Shah's "Exhibit 7" contains written deposition answers from Dr. John Shepherd (pages 2–12), Dr. Izabela Tarasiewicz (pages 13–18), Dr. Jeffrey Warman (pages 19–26), Dr. Charles Baldwin (pages 27–36), Dr. Juan Bonilla (pages 45–49), a "Notice of Intent to Take Deposition by Written Questions" and enclosed list of the locations of four doctors (pages 42–44) (one of whom is listed as "Dr. Thomas Gowan"), as well as "Exhibit B" and "Exhibit C" that appear to be from the 2012 STAR-BHS Agreement (pages 37–41). *See* ECF No. 49-2.

[16] *See, e.g.*, ECF No. 48 ¶ 24 ("[BHS] excluded Tejas Pediatric Anesthesiologists and Plaintiff from practicing in BHS"); *Id.* ¶ 28 ("BHS, in combination with STAR, began a concerted effort to eliminate the ability of any pediatric anesthesiologist in San Antonio not under contract with STAR from providing care to children and neonates in BHS facilities"); *Id.* at 29 (describing the STAR-BHS exclusivity agreement and accusing STAR of "gaining a true monopoly over the BHS hospital system in Bexar County" and "foreclosing 70% of all pediatric anesthesiologists, not just the Plaintiff, from working in BHS facilities"); *Id.* ¶ 30 ("an undisputed timeline of events took place…that

in fact explicitly testified that he did not look to any evidence related to non-BHS facilities.[17]  Dr. Shah also admits that he did not perform any sort of analysis or present any evidence, other than his own opinion, regarding BHS' share of the market,[18] and that even in his opinion he concedes BHS is only the second- or third-largest provider of pediatric anesthesia services in the area.[19] Even the harm that Dr. Shah personally suffered—exclusion from practicing—is limited to BHS. *See* ECF No. 38-1 69:14–16 (Q: "But the only exclusion that you're claiming is exclusion from the Baptist Health System?" A: "Yes.")

Dr. Shah's evidence of harm to a single competitor (himself) in a single hospital system is insufficient to overcome summary judgment on Sherman Act antitrust claims.  This Court agrees with many others that have held a hospital's staffing decision, without more, does not violate the Sherman Act.  *See BCB Anesthesia Care, Ltd. v. Passavant Mem'l Area Hosp. Ass'n*, 36 F.3d 664, 667–68 (7th Cir. 1994) (collecting cases and noting that "[t]he cases involving staffing at a single

---

provided STAR Anesthesia a true monopoly <u>over the BHS hospital system</u>"); *Id.* (describing the "conspiracy engaged in by BHS and STAR Anesthesia to eliminate 70% of pediatric anesthesiologists from providing pediatric anesthesia services <u>in BHS facilities</u>"); *Id.* ¶ 31 ("because of the dire shortage of pediatric anesthesiologists created by BHS <u>in its own facilities</u>," BHS assigned non-pediatric anesthesiologists to provide services to children and infants); *Id.* ¶ 32 ("Defendants do not deny that they in fact did eliminate product market choice <u>in their facilities</u>"); *Id.* (referencing BHS data that purportedly shows price increases in its own facilities); *Id.* ¶ 34 (BHS eliminated "Plaintiff as the preferred pediatric anesthesiologist <u>in BHS</u>"); *Id.* (Defendants did "not allow Plaintiff to provide pediatric anesthesia care <u>at North Central Baptist Hospital</u>"); *Id.* ¶ 36 ("In determining the existence of an anti-trust [sic] injury, Plaintiff also reviewed and/or provided" six cited exhibits, all of which relate only to BHS facilities); *Id.* ¶ 37 (summarizing written depositions from pediatric subspecialists which contained complaints related only to BHS facilities) (emphasis added throughout).

[17] *See* ECF No. 38-1 229:11–230:2 (Q: "There is no information in [Dr. Shah's expert report] about the quality of medical care provided at facilities other than Baptist facilities, is there?" …A: "No."); *Id.* 230:11–14 (Q: "…you don't have any information about any of those factors and their impact on those other [non-BHS] hospitals, correct?" A: "That is correct.")

[18] *See id.* 230:22–231:15 (Q: "You made no effort to figure out what portion of the market Baptist represents…" A: "…I have not done those studies…I'd say Baptist's representation is pretty significant… So my assumption is their market share must be significant.  I cannot place a number on that.")

[19] ECF No. 38-1 68:6–69:8 (Q: "And the Baptist Health System and its hospitals are the third largest provider of pediatrics services by a number of discharges in the San Antonio area, correct?" A: "I don't know that number, sir." …Q: "Is Baptist the largest provider of pediatric services?" A: "I don't believe so.  I think that would be Methodist Children's." …Q: "And the second is CHoSA?" A: "I don't know that…I don't have that data… and again, I'm not sure, but maybe Baptist might have been the second largest.")

hospital are legion… Those hundreds or thousands of pages almost always come to the same conclusion: the staffing decision at a single hospital was not a violation of section 1 of the Sherman Act."); *see also Ginzburg*, 993 F. Supp. at 1013 ("[E]very court that has addressed this issue has held or suggested that, absent an allegation that the hospital is the only one serving a particular area…a physician may not limit the relevant geographic market to a single hospital.")  Dr. Shah centers his antitrust claims and his summary judgment evidence entirely around himself and his practice at BHS facilities.  Without evidence of market-wide harm to the consumers of pediatric anesthesia services, Dr. Shah's antitrust claims fail as a matter of law and Defendants are entitled to summary judgment.  *See Benson v. St. Joseph Reg'l Health Ctr.*, 575 F.3d 542, 549 (5th Cir. 2009) (affirming summary judgment because physician's "inability to service patients at the hospital of his choice does not demonstrate an unreasonable adverse impact on…services for the entire county.")

> d.  Plaintiff's Tortious Interference Claim

Finally, Defendants argue that they are also entitled to summary judgment on Dr. Shah's tortious interference claim because it depends on the "unlawful action" of the antitrust claim.[20] So, Defendants argue, if the latter claim fails so must the former.  ECF No. 40 at 27.  Dr. Shah has failed to respond to any argument on his tortious interference claim.  The Court agrees with Defendants that Dr. Shah's tortious interference claim fails as a matter of law.  To prevail on a claim of tortious interference, Dr. Shah must prove Defendants undertook "unlawful actions…without a legal right or justifiable excuse."  *D'Onofrio*, 888 F.3d at 214.  Dr. Shah,

---

[20] Defendants also argue that Dr. Shah's tortious interference claim against them must fail because another court has already rendered a final judgment on the merits of this claim.  Defendants claim that Dr. Shah cannot bring this claim against them based on the same facts that an arbitrator and Texas courts reviewed and found "no credible evidence of tortious interference."  The final judgment Defendants reference was in favor of STAR in the dispute between it and Dr. Shah for his termination.  Defendants were not party to that litigation, and this Court will not bind itself by the findings of an arbitrator and Texas courts in an altogether separate proceeding.

through his counsel, has admitted to this Court that the only "unlawful action" underpinning his tortious interference claim is the alleged antitrust conduct. ECF No. 38-7 12:3–13 ("So my wrongful act is the antitrust.") For all of the reasons stated above, Dr. Shah's antitrust claim fails, and so his tortious interference claim fails, too.

## CONCLUSION

For the reasons stated herein, the Court **GRANTS** Defendant's Motion for Summary Judgment (ECF No. 40). Defendants' Motion to Exclude (ECF No. 39) and Plaintiff's Motion to Strike (ECF No. 34) are **DISMISSED** as moot.[21] The Clerk is **DIRECTED** to enter judgment in favor of Defendants and to **CLOSE** this case.

It is so **ORDERED**.

**SIGNED** this 9th day of April, 2020.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

---

[21] Tier 1 discovery was limited to the threshold issues of (1) antitrust injury and (2) relevant market. Dr. Shah designated himself as the sole testifying expert on Tier 1 topics, and Defendants moved to exclude him as an expert. *See* ECF Nos. 36-2, 39. As stated above, the Court's grant of summary judgment is based on the merits, not on antitrust standing. *See supra* Section II(a). And even assuming the admissibility of Dr. Shah's opinions on relevant market, they are insufficient to support his purported relevant market definition as a matter of law. *See supra* n.11. Because the Court's summary judgment analysis does not depend on the exclusion of Dr. Shah's opinions, Defendants' Motion to Exclude is moot. Defendants designated Dr. Robert Maness as their testifying expert on Tier 1, and Dr. Shah moved to strike his expert testimony. *See* ECF Nos. 34-1, 34. Defendants do not rely on Dr. Maness' opinion in arguing for summary judgment, and so the Court need not consider his opinion or whether to exclude it. Dr. Shah's Motion to Strike is therefore also moot.